GREEN BAY LUMBER COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 1315. Promulgated May 11, 1944.

*O. L. Dykstra, Esq.,* for the petitioner.
*Gene W. Reardon, Esq.,* for the respondent.

#### OPINION.

MELLOTT, *Judge:* The Commissioner determined a deficiency in petitioner's excess profits tax for the year 1941 in the amount of $5,092.75 and overassessments in its income tax for the years 1940 and 1941 in the aggregate amount of $1,547.11.

The proceeding was submitted upon a stipulation of facts, all of which are accordingly found. The sole issue is whether the Commissioner erred in determining that a deduction of $8,000 was not abnormal in class and therefore should not be treated as an unallowable deduction under section 711 (b) (1) (J) (i), I. R. C., in computing petitioner's credit for 1941 excess profits tax purposes.

Summarizing the facts, petitioner is an Iowa corporation engaged principally in the retail lumber business, with numerous sales yards in the State of Iowa and its principal office in Des Moines, Iowa. Its income and excess profits tax returns were duly filed with the collector of internal revenue at Des Moines. During 1924 and 1925 it advanced

a total of $28,500 to 12 of its principal employees for the purpose of enabling them to purchase capital stock in the Eagle Lumber & Supply Co. of Jackson, Mississippi (hereinafter called Eagle). Eagle was organized in 1924 for the purpose of operating retail lumber yards in Mississippi. Petitioner encouraged its employees to purchase stock in Eagle and during 1926 to 1935, inclusive, it also acquired such stock.

The advances to the employees were evidenced by their personal notes, due one year from date, with interest. The stock in Eagle was endorsed in blank and attached to the notes as collateral security. It was understood that there would be no personal liability of the individual employees on the notes and it was the intention of all the parties that the major portion of the obligations would be paid out of dividends on the Eagle stock. While petitioner, prior to January 1926, had financed certain of its employees in new enterprises and had stood the loss when they proved unprofitable, it was resolved at a meeting of the stockholders in that month that it would not do any such financing in the future.

Dividend payments were credited on the notes referred to above and other payments were made by the employees. Four of the notes were paid in full. One of the remaining eight debtors died in 1939 and two resigned prior to 1936. Prior to 1932 payments of principal totaling $11,827.83 had been made on the notes and on January 1, 1939, a balance of $16,672.17 was due, represented by eight notes varying in amount from $500 to $4,500. In 1939 Eagle started liquidation proceedings and at the close of that year the equity of the stockholders in its assets was nominal, the book value being not in excess of $11,618.90 on January 10, 1940, as against total outstanding capital stock of $275,400. Because of the financial condition of Eagle no action was taken by petitioner to possess the collateral security behind the note obligations and on December 31, 1939, petitioner charged off the balance of employee notes, as worthless, in the amount of $16,672.17.

"A bad debt loss on the employee obligations in the amount of $16,-672.17 was claimed by petitioner for income tax purposes as a deduction from gross income for the year 1939, and the Commissioner originally disallowed the entire loss, on the premise that petitioner took no steps to enforce collection or to take over the stock, thus indicating that it did not intend to enforce collection. Upon reconsideration the petitioner's income tax liability for the year 1939 was closed based upon the allowance of a deduction in the amount of $8,000.00 of the said sum of $16,672.17 claimed on the return in consideration of * * *" a collateral agreement set out in the stipulation.

The "collateral agreement" is signed only by petitioner and states that it, in consideration of the closing of its income and excess profits tax case for the year 1939 on the basis of a net deficiency of $2,616.19,

agrees: (1) That it will not claim any deductions as bad debts or otherwise for any taxable year subsequent to 1939 in respect to the following debts claimed as bad debt deductions on its 1939 income and excess profits tax return (listing the eight employee notes aggregating $16,-672.17); and (2) that it, "as an integral part of this agreement, has concurrently executed an agreement, Form 870 T.S. disclosing a deficiency in income tax · * * * of $2,408.41 and * * * in excess-profits of $208.58 for the year 1939." The concluding paragraph is as follows:

This agreement, together with all instruments executed thereunder, constitutes an entire basis for closing the case subject to acceptance by or on behalf of the Commissioner of Internal Revenue, and in event of his failure to accept any provisions thereof, no part of this agreement shall have any force or effect.

Petitioner has been allowed the following deductions for bad debts:

| | |
|---|---|
| 1935 | $17,903.89 |
| 1936 | 11,631.71 |
| 1937 | 15,367.00 |
| 1938 | 5,276.64 |
| 1939 | 14,739.52 |
| 1940 | 8,960.97 |
| 1941 | 8,521.25 |

"The above amounts do not include any bad debts with respect to money loaned to employees or others, except that the deduction of $14,-739.52 for the year 1939 includes the $8,000 loss above referred to."

Since the years 1924 and 1925 petitioner has not advanced money to any of its employees or to any other person for the purpose of enabling him to purchase stock. Loans made to employees have been in nominal amounts for the purpose of giving incidental financial assistance and any such have all been repaid. From time to time petitioner, in the course of its business, has made loans to its customers, including advances to contractors for pay roll and similar expense. It also has been obliged on occasion to take possession of property in satisfaction of customers' obligations, and such property has been sold by it on installment contracts.

The "Excess Profits Tax Act of 1940" was added to the Internal Revenue Code by section 201 of the Second Revenue Act of 1940. It has since been amended by the "Excess Profits Tax Amendments of 1941," approved March 7, 1941, by Title II of the Revenue Act of 1941, by Title II of the Revenue Act of 1942, and by chapter 279, Public Law 172, approved October 26, 1943. Subparagraph (J) was added by section 3 of the Excess Profits Tax Amendments of 1941 and made effective retroactively to the date of the enactment of the Excess Profits Tax Act of 1940.

Section 710 (a), I. R. C., imposes a tax upon the adjusted excess profits net income, which term is defined in section 710 (b) as the

excess profits net income (as defined in section 711) minus the sum of: (1) A specific exemption of $5,000; (2) the excess profits credit allowed under section 712; and (3) the unused excess profits credit adjustment. Sections 711 to 720, inclusive, deal with the normal provisions of the act, especially determination of the excess profits credit.

The statute permits the use of an excess profits credit based either upon petitioner's income experience during its prior test period or upon its invested capital, according to whichever method of computation results in the lesser tax. Sec. 712 *et seq.*, I. R. C. In petitioner's case the computation based on income results in the lesser tax; so the credit is 95 per centum of its average net income for the base period years, i. e., 1936, 1937, 1938, and 1939. Sec. 713 (a) (1) (A). In computing the average base period net income it is necessary to ascertain the excess profits net income for each base period year. This is done by starting with the taxpayer's normal tax net income, as adjusted, and applying against it certain adjustments, by way of addition or subtraction, as provided in section 711. One of such adjustments is that provided for in section 711 (b) (1) (J) (i), I. R. C., i. e., the elimination of deductions of any class which were abnormal for the taxpayer. The section (including for clarity subsection (ii)), and the regulations are shown in the margin.[1]

---

[1]Internal Revenue Code, 54 Stat. 977 ; 55 Stat. 18–19—

SEC. 711. EXCESS PROFITS NET INCOME.

\* \* \* \* • • •

(b) TAXABLE YEARS IN BASE PERIOD.—

(1) GENERAL RULE AND ADJUSTMENTS.—The excess profits net income for any taxable year subject to the Revenue Act of 1936 shall be the normal-tax net income, as defined in section 13 (a) of such Act; and for any other taxable year beginning after December 31, 1937, and before January 1, 1940, shall be the special-class net income, as defined in section 14 (a) of the applicable revenue law. In either case the following adjustments shall be made \* \* \* :

\* \* \* \* \* \* \*

(J) Abnormal deductions.—Under regulations prescribed by the Commissioner, with the approval of the Secretary, for the determination, for the purposes of this subparagraph, of the classification of deductions—

(i) Deductions of any class shall not be allowed if deductions of such class were abnormal for the taxpayer \* \* \*.

(ii) If the class of deductions was normal for the taxpayer, but the deductions of such class were in excess of 125 per centum of the average amount of deductions of such class for the four previous taxable years, they shall be disallowed in an amount equal to such excess.

Regulations 109, sec. 30.711 (b)–2 (added by T. D. 5045, May 3, 1941, and amended by T. D. 5253, Mar. 27, 1943)—

*Abnormal deductions in base period.*—Adjustments in the excess profits net income for a taxable year in the base period are required in order to disallow deductions of a class which is abnormal for the taxpayer \* \* \*.

A class of deductions is abnormal only if the taxpayer had no deductions of that class in the taxable years prescribed for determining average deductions.

The taxpayer must establish that the abnormality \* \* \* of the deduction is not a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, and is not a consequence

Petitioner contends that "the grouping of deductions arising from non-recurring losses on money advanced * * * to employees for the purpose of purchasing stock of another corporation constitutes a class distinct and properly segregated from that of bad debts arising from trade obligations." It argues that for the purpose of determining whether deductions are of a class "abnormal for the taxpayer" no requirement is made by the statute that the items be grouped under the "statutory deduction categories" (the subdivisions of section 23, I. R. C.); that classification to determine abnormality should be made with reference to similarity of situation, circumstances, nature, attributes, relations and the like; that the mere fact there had been a grouping of the employees' notes with the business debts for the purpose of computing its income tax does not preclude it from segregating the two types into narrower and more specific subdivisions or classifications for present purposes; that such subdivision is appropriate in the light of its business experience and accounting practice and consistent with well recognized principles of good accounting; and that the statute, if given a reasonable interpretation in accordance with recognized canons of statutory construction, authorizes and requires that the $8,000 be eliminated in determining its excess profits net income for the base period year.

Respondent insists that the adjustment claimed, being in the nature of a deduction or credit, may not be allowed since it does not "come clearly" within the statutory provision; that the regulations do not permit the adjustment, but expressly prescribe that reference must be made to the deductions of the entire class rather than to any particular items included therein; that "all the bad debts allowed to petitioner as a deduction for the year 1939 are of one class, regardless of whether they resulted from sales of merchandise, loans and advances to employees, and other persons, or other business transactions"; that "debtors in default, regardless of whether they consist

of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer. * * *

      *           *           *           *           *           *

Deductions attributable to any claim, award, judgment, or decree against the taxpayer, or interest on any of the foregoing are all of the same class. Therefore, in determining in the case of a deduction for a judgment, for example, whether the class of deductions is abnormal or whether the amount thereof for any taxable year is in excess of 125 per cent of average deductions of the same class, account must be taken not only of the amount of deductions for judgments, if any, allowed in preceding taxable years, but also of any deductions arising out of claims, awards, and decrees, and interest thereon.

Deductions for intangible drilling and development costs paid or incurred in or for the drilling of wells or the preparation of wells for the production of oil or gas, and for development costs in the case of mines are all of the same class. Therefore, for the purpose of determining whether the deductions for one taxable year are abnormal or in excess of 125 per cent of average deductions of this class, and for the purpose of determining the amount to be disallowed in such event, reference must be made to the deductions of the entire class, rather than to any particular deductible items included therein. Deductions attributable to the operation of wells or mines are not included in this class.

of officers or employees &ast; &ast; &ast;, other individuals or corporations to whom petitioner may have made loans, purchasers of its products, or other persons, constitute a collective group"; that the "comprehensive term 'class', as used in the taxing statute, encompasses all defaulted debtors and the corollary bad debt deductions, regardless of the fact that an employer-employee relationship may exist between the debtors and their creditor and regardless of the source or cause of the indebtedness"; and that the facts in any event do not establish that the particular loans were abnormal, unusual, or extraordinary.

The parties devote a substantial part of their respective briefs to a discussion of the terms "class," "classified," and "classification." The cases cited by them are not particularly helpful. Thus in *Ex parte Rowley* (Sup. Ct. S. C., 1942) 20 S. E. (2d) 383, cited by respondent, the court stated that it seemed "all the policyholders form a most appropriate class for application of the statute [sec. 406 of the code]," authorizing one or more to sue or defend for all. Petitioner points out that the same court on the same day handed down another decision (*Powell* v. *Gary*, 20 S. E. (2d) 391) in which it recognized that policyholders might appropriately be divided into three classes. It also quotes at length from *In re Harpke et al. Doyle* v. *Milwaukee National Bank of Wisconsin*, 116 Fed. 296, in which the court construed and applied section 60 of the Bankruptcy Act, dealing with preference of "creditors of the same class," and refers to the following language used by the Supreme Court in *Truax* v. *Corrigan*, 257 U. S. 312:

Classification is the most inveterate of our reasoning processes. We can scarcely think or speak without consciously or unconsciously exercising it. It must therefore obtain in and determine legislation; but it must regard real resemblances and real differences between things and persons and class them in accordance with their pertinence to the purpose at hand.

Both parties quote the dictionary definition of the term class—a group of persons or things [objects] having certain qualities [attributes] in common. The definition is only suggestive and supports respondent's view that bad debts constitute a class as well as petitioner's theory that bad debts may be divided into groups or classes even as population may be divided into races, sexes, and age groups and also into rich and poor, educated and illiterate, etc. Some aid in determining the sense in which the term is used in subsection (J) may be secured by examining the legislative history.

As stated above, subsection (J) was added by the "Excess Profits Tax Amendments of 1941." The report of the Committee on Ways and Means[2] refers to the purposes of the original enactment,[3] which

[2] H. R. No. 146, 77th Cong., Feb. 24, 1941.
[3] Second Revenue Act of 1940.

were to provide additional revenue urgently needed to help meet the costs of the national defense program and to prevent the rearmament program "from furnishing an opportunity for the creation of new war millionaires * * *." It states that the tax rates (or even higher ones) "are thoroughly justified if the income subject thereto is clearly of the type intended to be reached. At the same time, equitable considerations demand that every reasonable precaution be taken to prevent unfair application of the tax in abnormal cases. The weight of the burden imposed carries with it a commensurate need for restricting its application to the cases for which it was designed."

In formulating and enacting the original legislation the Committee and the Congress "exercised caution both with respect to the methods provided for measuring the portion of the corporate earnings to be subjected to the tax and in alleviating the specific hardships which were disclosed." It was recognized that the "hastily designed provision" incorporated in the earlier act was inadequate; but it was "inserted in the law as a token of assurance to taxpayers that further Congressional action would be taken." Following study by the Treasury and members of the staff of the Joint Committee on Internal Revenue Taxation, the legislation of which subsection (J) is a part was enacted. The legislation "attempts to provide, both by specific terms and in carefully guarded general terms, a set of flexible rules which should alleviate at least the bulk of the severe hardship cases which may arise." It was recognized, however, that the success or failure of the legislation depended "to a considerable degree, upon its intelligent and sympathetic administration." It did not attempt to define the words used.

In our judgment subsection (J) was intended to be, and is, a remedial statute. It should therefore have a reasonable and rational construction in order that it may "give the relief it was intended to provide." *Bonwit Teller & Co.* v. *United States*, 283 U. S. 258; *Helvering* v. *Bliss*, 293 U. S. 144; *United States* v. *American Trucking Associations, Inc.*, 310 U. S. 534; *United States* v. *Dickerson*, 310 U. S. 554. A reasonable and rational construction, we think, does not require that classification of deductions necessarily follow the pattern of section 23. That this is so is suggested by subsections (H) and (I), enacted at the same time as subsection (J), and by the pertinent regulations. Thus under (H) deductions attributable to a claim or judgment against the taxpayer include interest and "are all of the same class." So also are intangible drilling and development costs for the drilling of wells or the preparation of wells for the production of oil or gas and for development costs in the case of mines under subsection (1). Moreover the regulations recognize that deductions which do not fall within either of the classes specified in section 711

(b) (1) (H) (I) "may be grouped by the taxpayer, subject to approval by the Commissioner on examination of the taxpayer's return, in such other classes as are reasonable in a business of the type which the taxpayer conducts, and are appropriate in the light of the taxpayer's business experience and accounting practice * * *." The statement to be filed by the taxpayer with its return is required to include a description and the amount of each item included in the class of deductions for the taxable year for which such deductions are disallowed and for the taxable years in the test period, with the amount of each and a description thereof. While the classification is required to be "consistent with any classification made by the taxpayer under the provisions of section 721 and section 722 [relief provisions]," there is nothing to require that the classification be consistent with that made by the taxpayer under section 23 when the return for the base period year was filed.

The question is difficult and the right answer is elusive. We are of the opinion, however, that Congress did not intend to limit classification of deductions for the purposes of subsection (J) to the "statutory deduction categories" of section 23. This is not to say we disapprove or find to be unsound the requirement of the regulation that "reference must be made to the deductions of the entire class rather than to any particular deductible items therein." We merely hold that bad debts do not all have to fall into a single class—a view, incidentally, specifically recognized by section 23 (k), I. R. C., which classifies bad debts into those coming within the "general rule," securities becoming worthless, nonbusiness debts, and securities of affiliated corporations. The question therefore becomes largely one of fact, i. e., whether the $8,000 item is of a different class from the other bad debts which were claimed and allowed.

Respondent insists that the required showing has not been made. We do not agree. The stipulation states that the amounts allowed in the other years "do not include any bad debts with respect to money loaned to employees or others, except that the deduction of $14,739.52 for the year 1939 includes the $8,000 * * *." The reasonable interpretation of this language, we think, is that the debts comprising the $8,000 item were of a different class. That, in our judgment, is sufficient for present purposes.

No claim is made that subsection (K) of section 711 (b) (1), which contains some rules limiting the application of subsection (J), is applicable here. Cf. *William Leveen Corporation*, 3 T. C. 593, and *Premier Products Co.*, 2 T. C. 445. The sole question is whether two different kinds of bad debts may be put into separate classes. We have decided that they may be. Since under the stipulated facts "the taxpayer had no deductions of * * * [the same class as the

$8,000] in the taxable years prescribed for determining average deductions," the "class of deductions is abnormal" under the regulation and may be "disallowed" under subdivision (i) of subsection (J), *supra*. We are therefore of the opinion and now hold that petitioner's claim for adjustment should be allowed.

Uncontested adjustments and concessions of the parties require that the deficiency be recomputed. Therefore,

Reviewed by the Court.

*Decision will be entered under Rule 50.*