SURFACE COMBUSTION CORPORATION, PETITIONER, ET AL.,[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 7438, 7439, 7440, 7441, 7442.
Promulgated October 9, 1947.

---

[1] Proceedings of the following petitioners are consolidated herewith: General Properties Co., Inc., Transferee; Charles A. Frueauff, Transferee; W. Alton Jones, Transferee; and Grace R. Doherty, Transferee.

*John J. Kendrick, Esq.*, for the petitioners.
*Thomas F. Callahan, Esq.*, for the respondent.

642

OPINION.

KERN, *Judge*: *Janitrol.*—The applicable sections of the excess profits tax act are set forth below.[1] The first argument advanced by

---

[1] SEC. 711 [I. R. C.]. EXCESS PROFITS NET INCOME.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(b) TAXABLE YEARS IN BASE PERIOD.—

(1) GENERAL RULE AND ADJUSTMENTS.—The excess profits net income for any taxable year subject to the Revenue Act of 1936 shall be the normal-tax net income, as defined in section 13 (a) of such Act; and for any other taxable year beginning after December 31, 1937, and before January 1, 1940, shall be the special-class net income, as defined in section 14 (a) of the applicable revenue law. In either case the following adjustments shall be made (for additional adjustments in case of certain reorganizations, see section 742 (e)):

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(H) Payment of Judgments, and So Forth.—Deductions attributed to any claim, award, judgment, or decree against the taxpayer, or interest on any of the foregoing, if abnormal for the taxpayer, shall not be allowed, and if normal for the taxpayer, but in excess of 125 per centum of the average amount of such deductions in the four previous taxable years, shall be disallowed in an amount equal to such excess;

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(J) Abnormal Deductions.—Under regulations prescribed by the Commissioner, with the approval of the Secretary, for the determination, for the purposes of this subparagraph, of the classification of deductions—

(i) Deductions of any class shall not be allowed if deductions of such class were abnormal for the taxpayer, and

(ii) If the class of deductions was normal for the taxpayer, but the deductions of such

petitioner with respect to this issue is that the expenditures incurred by it in the correction of defective heating units were abnormal for petitioner, and were attributable to claims against petitioner, within the meaning of section 711 (b) (1) (H) of the Internal Revenue Code.

The heaters were sold under a warranty of freedom from defects and workmanship for a period of twelve months. When the defects were discovered, petitioner realized at once the potential danger of disaster inherent in the use of such defective units in crowded spaces, and the program described in our findings of fact, designed to correct the defect by the replacement of the affected parts, was immediately undertaken. Complaints had been received from users of the heaters, but we are unable to determine the number or character thereof. The program referred to was intended to and did reach every unit which had been sold or stocked by dealers, regardless of whether a complaint had been received concerning it, or, indeed, whether any difficulty had been experienced in its operation.

Deferring for a moment a discussion of the abnormal character or amount of the expenditures, the applicability of section 711 (b) (1) (H) depends on an interpretation of the word "claim" used therein.

It is generally understood not to be limited strictly to adjudicated claims, or to such formal claims as are encountered in many fields of the law.

A claim for damages, which is accompanied and fortified by a threat of litigation, has been held to be within the language of the section. *R. C. Harvey Co.*, 5 T. C. 431. The dictionary definition of the word, provided by Webster's New International Dictionary, p. 408, is:

1. A demand of a right or supposed right; a calling on another for something due, or supposed to be due; an assertion of a right or fact;
2. A right to claim something  *  *  *.

While the facts indicate that some portion of the expenditures here were attributable to complaints received, at least some of which were probably claims, as defined above, it must be admitted that it is equally apparent that not all the expenditures were. The fact that the expenditures which were not attributable to claims were intended by petitioner to obviate future claims, or to eliminate potential claims, does

---

class were in excess of 125 per centum of the average amount of deductions of such class for the four previous taxable years, they shall be disallowed in an amount equal to such excess.

(K) Rules for Application of Subparagraphs (H), (I), and (J).—For the purposes of subparagraphs (H), (I), and (J).—

*      *      *      *      *      *      *

(ii) Deductions shall not be disallowed under such subparagraphs unless the taxpayer establishes that the abnormality or excess is not a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, and is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer.

(iii) The amount of deductions of any class to be disallowed under such subparagraphs with respect to any taxable year shall not exceed the amount by which the deductions of such class for such taxable year exceed the deductions of such class for the taxable year for which the tax under this subchapter is being computed.

not seem to us to be sufficient to bring them within the plain language of the statute.

We are therefore of the opinion that the expenditures involved here have not been shown to have been attributable to claim within the meaning of the statute.

Petitioner urges, next, that the expenditures were of a class abnormal for it, such as are covered by section 711 (b) (1) (J) (i).

The evidence shows that petitioner put a new model Janitrol heater on the market in September of 1937, in which defects were discovered which made its use under certain conditions potentially dangerous. Because of the warranty under which the heaters were sold, and its recognition of the possibility of its liability for damages in case of disaster, petitioner took immediate and extraordinary steps to replace the defective parts in every heater which had been sold and thereby incurred expenses far in excess of the amounts which were normally required for the replacement of defective units.

Respondent contends that the expenditures were not abnormal in character, as indicated by the fact that petitioner regularly maintained a reserve on its books, which was set up on a basis devised by petitioner as a result of its experience over the years, against which it charged whatever expenditures were incurred for servicing unsatisfactory units, or replacing defective ones. Petitioner admits such items were common in its experience, but contends the expenditures in dispute were of a different class.

The question is not easily resolved. In *Green Bay Lumber Co.*, 3 T. C. 824, we had for determination the question whether a certain group of bad debts, distinguishable only by the fact that they stemmed from loans to employees, constituted a class of deductions separate and apart from bad debts growing out of trade transactions. There, as here, the taxpayer did not deny it ordinarily and normally had bad debt deductions, but it claimed the bad debts which were there the subject of dispute grew out of transactions which were distinct and properly segregated from other bad debts. After reviewing the legislative history of the provision with which we are presently concerned, and stating it to be our view that it was intended to be a remedial statute, entitled to a reasonable and rational construction in order to give the intended relief, we reached the conclusion that the employees' bad debts were of a different class from other bad debts.

Applying the reasoning which led to that conclusion to the facts here, it seems to support petitioner's contention that the expenditures occasioned by the heaters of defective design were different and distinguishable from the expenditures ordinarily incurred for regular servicing and replacement of defective or broken parts.

The evidence is clear that the defects which occasioned the expenditures were basic defects of design of a character never before ex-

perienced by petitioner, and certainly of a type not normally expected or encountered in the conduct of a business. We have already indicated our belief that they are sufficiently distinguishable from the ordinary expense incurred in servicing or replacement on account of breakage or defects in material or workmanship normally incident to the manufacture and sale of merchandise to justify their separation into a separate classification. Therefore, the fact that petitioner's experience normally embraced expenditures of the latter type does not make expenditures of the type here involved any the less abnormal. We are of the opinion that the deductions reflecting these expenditures were abnormal deductions within the meaning of the code.

However, in order to justify the statutory adjustment contended for by petitioner, it must also be established, as required by section 711 (b) (1) (K) (ii) of the code, that the abnormal expenditures were not a consequence of an increase in the gross income of the taxpayer in the base period, or a decrease in the amount of some other deduction in its base period, and were not a consequence of a change at any time in the type, manner of operation, size, or condition of its business.

With respect to the first factor mentioned in the statute, the gross income of the unit heater department, which is the department of petitioner's business which made and sold the Janitrol heaters which proved to be defective, was less in 1937 than in 1936, and still less in 1938. There was in 1937 an increase in the gross income of the space heating division, of which the unit heater department was a part, in an amount approximating $43,000 in 1937 over 1936, but, since the income of the unit heater department was less, the increase was due to the increased sale of other products than the Janitrol heater, and, since the abnormal expenditures were the result of sales of Janitrol and of no other product, it is clear that they can not be said to have been the consequence of such increased income of the space heating division.

With respect to the remaining elements set forth in the statute, respondent questions the sufficiency of proof that the abnormality was not due to a change at any time in the type or size of petitioner's business. It is his contention not only that petitioner has failed of such proof, but that the change of model, which, in the main, consisted of a new type of control valve, was the event which resulted in the abnormal expenditures, and that the adjustment is therefore prohibited.

We can not agree with respondent that bringing out a new model of a product regularly manufactured is such a change in "type * * * of * * * business" as the statute contemplates. Respondent next contends that petitioner has not shown the abnormalities were not due to a change in the size of its business. On this point, respondent argues from the record that petitioner's sales during the base period years were vastly increased over the year 1933, indicating

a substantial expansion in the size of the business, that this expanded condition prevailed in 1937, when most of the defective heaters were sold, and that petitioner has not shown the expenditures to be unrelated to the increase in sales. We think petitioner has met this challenge in the manner suggested in *Wm. Leveen Corporation*, 3 T. C. 593, by proving affirmatively that the abnormal expenditures were the consequence of a basic defect in design. Since the expenditures here were of one special type, limited to one certain model of heater, they can not be said to have been caused by sales of any other product, and any changes in the size of petitioner's business which did not affect, contribute to, or cause in any way the abnormal expenditure involved are immaterial.

We conclude, therefore, that petitioner has met its responsibility under the statute, and that respondent erred in refusing to adjust the base period income on account of the Janitrol expenditure.

*Kathabar.*—The issue with respect to the Kathabar expenditures is narrowed on brief to the question of whether they were a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in. It is argued by respondent that they were the direct consequence of the entry of petitioner into the air-conditioning equipment field, which constituted a change in the type of its business to that extent.

The facts show that petitioner acquired the license under which it intended to produce air-conditioning equipment in 1934. It began its experiments in the development of the Kathabar equipment in that year. Late in 1934 it installed three industrial units, in 1935 it installed six domestic units, and in 1936 it installed about five industrial units, in different sections of the country, all of which were experimental sales. None of the 1934, 1935, or 1936 units performed satisfactorily and changes and corrections continued to be made as the result of experience and experiments based thereon. During 1936 the corrosion problem arose, as described more fully in our findings. Experiments were continued in a special effort to meet this problem, which was finally solved in 1938.

Petitioner contends that its expenditures during 1934 and 1935 were normal research and development expenses, but that the expenditures incurred in 1936, 1937, and 1938 were unusual and abnormal expenditures necessitated by wholly unexpected and basic defects in the system which arose some years after the manufacture of Kathabar was undertaken.

We are convinced from the facts before us that the experimental and development work on Kathabar which began in 1934 continued until 1938, when for the first time petitioner had an air-conditioning device, capable of functioning satisfactorily, to put on the market. The cor-

rosion problem which was the chief difficulty in 1936 to 1938 was simply one of the problems encountered in the development process, and petitioner does not claim to have had a satisfactory unit on the market before that problem arose. The manufacture of the equipment was in experimental stages and the few units which were installed were themselves looked upon as experiments. The need for all of these research and development expenses was occasioned by petitioner's entrance into a new field of business, and not only has petitioner been unable to prove the expenditures involved here were not the consequence of a change in the type of its business, but the evidence seems to us to show affirmatively that they were. Respondent's refusal to disallow them was therefore not in error.

*Profit-sharing trusts.*—Respondent disallowed deductions for the two contributions of $175,000 each, totaling $350,000, to two trusts, one for the benefit of executives, and the other for sales employees of the corporation. The trusts are similar in terms, which have been set out in detail in our findings. So far as they relate to the rights of the beneficiaries, they provided, briefly, that the trust fund would in each case be allocated to the individual employee covered thereby in the proportion that his average total compensation for the five preceding years (or years employed, if less) bore to the total of the average compensation of all participants, similarly computed, and that each beneficiary would receive all of his allocated share in the event of (1) his illness or disability causing his permanent removal from the pay roll; (2) his death, in which event his legatees or heirs would receive it; (3) the cessation of business by the company of the kind requiring the services of the beneficiary; and, (4) in the event his compensation in any year fell below 90 per cent of his average compensation for the five preceding years, payment would be made to him from the fund to the extent necessary to assure him of 90 per cent thereof. In the event of his voluntary withdrawal from the fund, or from the employment of petitioner, or his discharge, his right of participation would be forefeited, but his share would be divided ratably among the remaining beneficiaries.

Petitioner claimed a deduction in the amount of its contributions to the two trusts as an ordinary and necessary expense under section 23 (a) on three alternative grounds: First, as reasonable compensation to the employees covered by the trusts; second, because the trusts qualified for tax exemption under section 165; and, third, because the trusts constituted a part of the program to dispose of the participants' claims under the preexisting bonus plans and the payments thereto were accordingly ordinary and necessary business expenses.

Respondent contends the deduction can not be allowed as reasonable compensation paid for services actually rendered, first, because petitioner's contributions to the trusts are not "compensation [paid]"

within the meaning of section 23 (a) of the Internal Revenue Code, and, second, because, if they are, the trust funds, together with the cash paid the employees covered by the trusts, constitute excessive and unreasonable compensation.

Respondent argues earnestly that the employees had no vested right to any part of the funds, that none reported for taxation as income any amount allocated to him in the trusts, that the trust funds were not, in any event, compensation for services actually rendered, since one of the express purposes of the trusts was the compensation of the employees in some future years for services to be rendered then. Respondent contends, also, that petitioner could recapture its contribution, and that the benefits to the employees were so uncertain, indefinite, and intangible as to bring this case within the orbit of *Lincoln Electric Co.*, 6 T. C. 37.

Petitioner, on the other hand, depends for support on *Gisholt Machine Co.*, 4 T. C. 699.

Subsequent to the submission of the instant case, the Circuit Court of Appeals for the Sixth Circuit reversed this Court's decision in *Lincoln Electric Co., supra*, 162 Fed. (2d) 379.

Because we are of the opinion that the instant case is distinguishable from the *Lincoln Electric Co.* case and is governed by our reasoning in the *Gisholt Machine Co.* case, it is unnecessary for us at this time to determine whether we shall adhere to our views expressed in the *Lincoln Electric Co.* case in spite of its reversal by the Circuit Court.

Without discussing in all of its details the *Lincoln Electric Co.* case, *supra*, we shall merely point out those respects in which it seems to us to be distinguishable from the facts now before us. Upon facts presented in the cited case, we decided that the benefits to any employee were too uncertain and nebulous to justify any contention that he received anything of value, since neither he nor his estate could ever receive anything unless he remained with the company over a long period of years. In the instant case, an employee is entitled to distribution of an amount sufficient to reimburse him for the loss of salary in any year to the extent that his salary falls below 90 per cent of his previous five-year average. In addition, if he becomes permanently disabled, he is entitled to the full amount credited to him; if he dies, his legatees or heirs at law receive the entire amount; and if his services are no longer required by petitioner in the conduct of its business, he receives the entire amount allocated to him. He forfeits his rights in only two events—if he voluntarily leaves the petitioner's employ, or if he is discharged for cause. In either such case, his allocated credit is prorated among all the other employees.

These are certainly rights which are of substantial value to the employee, and are in many respects more substantial than those which the employees had and which were considered in *Gisholt Machine Co.*,

*supra.* There, most of the contingencies upon which distributions might be made to participants depended upon the discretion of the trustees, but, in the event of the death of a participant before complete distribution of his trust share, such share was distributable to such beneficiaries as he should designate. This latter absolute right, which was considered a "very significant" distinction in *Lincoln Electric Co., supra,* is present in the case now before us, and, in addition, there are certain rights, not subject to any discretion of the trustees, to distributions in the event of physical disability, lowering of salaries, and release because his services are not required by the business of the employer.

We are convinced that these are not the indefinite, intangible or uncertain rights of *Lincoln Electric Co., supra,* and that they are, in fact, stronger and more valuable to the employees than those involved in *Gisholt Machine Co., supra.* They are not, therefore, for that reason, deprived of their character as "compensation paid."

One important distinction between the instant case and the *Lincoln Electric Co.* case is that we have here found that the payments to the trusts made by petitioner constituted reasonable compensation for services rendered to petitioner during the taxable year and were not in the nature of gratuities. This will be discussed more fully later.

The words used in our opinion in *Lincoln Electric Co., supra,* p. 54, to distinguish that case from *Gisholt Machine Co., supra,* might be used with equal felicity to distinguish that case from the instant case.

Respondent finally suggests that the petitioner retained such control over the funds that it should be denied the deduction, first, by providing for an election to terminate the trusts in the event they should be held to be taxable by the Commissioner of Internal Revenue, and, second, because it would be possible for petitioner to favor one group of employees by reducing their salaries, in some future year, far more drastically than it reduced the salaries of less favored employees, thus enabling the more favored employees to receive in distribution sufficient amounts to equal 90 per cent of their previous five-year average, while the less favored group, not having suffered a reduction below 90 per cent of their average, would be denied a distribution.

The second argument advanced by respondent on this point, and set out above, is without merit.

The first argument advanced by respondent on this point, and summarized above, has given us great difficulty. Were it not for this contingent right of petitioner to terminate the trusts and receive repayment of its contributions to them, we would have little difficulty in holding that these contributions were deductible under section

23 (a) for the reasons set forth above and those which we later give for our conclusion that the contributions constituted, in part, reasonable compensation to petitioner's employees for services rendered in the taxable year. We are thus faced with the paradoxical problem of how to treat compensation payments which would be deductible under section 23 (a) unless precluded by a contingency within the control, not of petitioner or of its employees, but of the Commissioner of Internal Revenue. The contingency which is urged as a reason for us to hold the contributions in question are not deductible is the contingency that they may not, in the opinion of the Commissioner or of the courts, be deductible.

In a somewhat analogous case a similar contingency was held to be void as contrary to public policy. See *Commissioner* v. *Procter*, 142 Fed. (2d) 824. However, we shall assume, *arguendo*, that the contingency here urged is valid, for, even on this assumption, we are of the opinion that its existence will not preclude the deduction claimed.

If the contributions in question "were subject to be paid back to the corporation on the happening of contingencies within the control of the employees," their deduction would not be disallowed on that account. *Oxford Institute*, 33 B. T. A. 1136. If, on the other hand, the contingency was within the control of petitioner, the deduction of the contributions would be disallowed. See *Wilcox Investment Co.*, 3 T. C. 458.

In this case the contingency is within the control of the Commissioner of Internal Revenue, over whom petitioner obviously has no control and whose motives in the exercise or nonexercise of this contingent right obviously have no relationship to the desires or interests of petitioner or to the beneficiaries of the trusts. While there are no cases to our knowledge which are controlling authority on this precise question, we are of the opinion that the contingency under which petitioner might receive a repayment of the contributions should be treated as analogous to a contingency within the power of petitioner's employees and should not change the character of petitioner's payments to the trusts as present expenses of the corporation. Respondent's own administrative actions with reference to such a contingency have not been uniform or well established. See Bureau letters dated December 17, 1943, January 14, 1944, and January 16, 1945, quoted in 1946 CCH, vol. 1, §§338.40, 338.401.

It should be pointed out that the taxpayer has transferred the contributions from its own funds to the trusts; the trusts still exist and continue to hold the contributions, subject to the terms of the trusts; the petitioner is insisting that the contributions are deductible from its gross income and are therefore not recapturable by it; and

that, if we hold herein that they are properly deductible and our holding is affirmed, any contingency is done away with and the possibility of the petitioner recapturing the contributions disappears.

In order to be deductible as compensation paid, the contributions to the trusts must meet the test of reasonableness imposed by the statute upon all payments of compensation for services. We, therefore, next consider respondent's contention that the contributions to the trusts here in question do not constitute compensation for services which are reasonable in amount.

The evidence establishes, with respect to all of the employees covered by both trusts, that they were "key men," officers, executives, department heads, and assistant department heads. None owned any stock in petitioner. They were highly trained and thoroughly experienced technical or production specialists and their services were vital to the company's success. Their duties and responsibilities had increased with petitioner's expanding business and production facilities. Their fixed annual base salaries were low. All had served petitioner for at least five years, and their average of years of service was considerably more.

· We shall not attempt here to discuss all the evidence before us relating to the services and the compensation of each of the men covered by the trusts. The most highly paid employee in the executive group was the president, whose base salary was $12,000, whose cash bonus was $18,000, and whose allocated trust credit was $21,100, a total of $51,100. The base salaries of each of the two vice presidents was $8,400, and their cash bonuses and trust credits were proportionately computed and their total compensation was $35,800. The scale descends through the assistant sales managers, whose base pay was from $7,800 to $6,000, and whose total compensations, including their trust credits, were from $28,660 to $22,000, and the department heads, assistants, and various key employees of miscellaneous classifications, whose base pay ran from $6,000 down to $2,700, and whose total compensation ranged from $22,000 to $5,400. In the sales group, the base salaries ranged from $5,535 down to $2,769, and the total compensation from $15,482 to $7,175. The corporate net sales increased from about $5,000,000 in 1936 to about $11,000,000 in 1941, and net profit before taxes from $700,000 in 1936 to almost $2,500,000 in 1941. No employees held any stock, and, therefore, there can be no suspicion that the payments were dividends in disguise. Had the trusts not been established to take the place of the preexisting bonus plan, every employee involved would have been entitled under such bonus plan to receive much greater amounts than his total compensation, including cash and trust credits, with which we are here concerned.

We conclude that the total compensation paid the employees covered by the two trusts was reasonable under the circumstances, and that respondent erred in denying the deduction involved. We do not consider it necessary to discuss petitioner's alternative contentions.

*Annualization method.*—This issue relates to the method of computing petitioner's excess profits net income for the first eleven months of 1941. As of December 1, 1941, petitioner's parent corporation, General Properties Co., was required to include petitioner's excess profits net income in its consolidated return for 1941. It therefore became necessary for petitioner to compute its excess profits net income for its own excess profits tax return for only the period January 1 to November 30, 1941. For that purpose, petitioner effected a closing of its books on November 30, which was done pursuant to the same standard accounting methods and procedures which were followed in closing the books at the end of the year, and according to the accounting methods and practices used by all of the subsidiary corporations of General Properties Co.

Section 711 (a) (3) (A) of the Internal Revenue Code sets out the method to be used in determining excess profits net income for a taxable period of less than 12 months. It provides:

* * * If the taxable year is a period of less than twelve months the excess profits net income for such taxable year (referred to in this paragraph as the "short taxable year") shall be placed on an annual basis by multiplying the amount thereof by the number of days in the twelve months ending with the close of the short taxable year and dividing by the number of days in the short taxable year. The tax shall be such part of the tax computed on such annual basis as the number of days in the short taxable year is of the number of days in the twelve months ending with the close of the short taxable year.

Petitioner's net income before taxes, per books, for the period January 1 to November 30, 1941, was $1,383,374.91. To this amount it added $51,774.25 for elimination of items applicable to 1940, and $130,307.01 for items recorded in subsequent periods applicable to period, and $133,957.23 for increases in unallowable reserves. It subtracted as adjustments made by revenue agents in other years the sum of $92,400.25, arriving at a total of $1,607,013.15 as its excess profits net income for the period January 1 to November 30, 1941.

Petitioner then annualized this by multiplying it by the fraction 365/334. After computing its excess profits tax liability on that basis, the amount of its tax was multiplied by 334/365, the resulting figure being its excess profits tax for the 11-month period.

Respondent, however, took petitioner's income, per books, for the entire year, made some adjustments and multiplied the resulting figure by 334/365, then annualized that by multiplying it by 365/334, and, having determined the tax on that basis, multiplied that by 334/365 to

reach the tax which it determined to be due. This method of computation respondent contends, is justified and required by section 33.32, Regulations 110, issued under authority of section 730 (b) of the code.[2]

The explanatory statement attached to the notice of deficiency questions the method used on the return in that "it does not present a clear and accurate determination of your excess profits net income for the eleven months of 1941 * * *." On brief respondent contends that petitioner's books were so kept that they did not accurately reflect its income.

The principal justification which respondent offers for having followed the method of computation provided by section 33.32, Regulations 110, is the fact that petitioner's income for December was disproportionately large, compared to the average of the first eleven months. But the evidence shows that petitioner's monthly income was subject to substantial variations, partly by reason of the fact that many of its jobs, particularly in the industrial furnace division, ran from a quarter of a million dollars up, and they were closed out to profit and loss upon completion. The completion of one or more such jobs, or the failure so to complete them, in any one month, greatly affected the corporation's income for that month. It appears from the evidence that the same standard bookkeeping methods and procedures were used by petitioner during the taxable year as had been used without question in the past, and that its books clearly reflected its income.

We conclude that petitioner correctly used the method prescribed by section 711 (a) (3) (A) of the code for determining its excess profits net income for the period January 1 to November 30, 1941, for which it was obliged to file a separate return, and that respondent erred in using the method provided by section 33.32, Regulations 110.

*Transferee liability.*—The final issue presented relates to the liability as transferees of General Properties Co., W. Alton Jones, Grace R. Doherty, and Charles A. Frueauff.

The parties stipulated that General Properties Co. was the transferee of all the assets of petitioner, as the result of a transfer which left petitioner without assets from which to pay the deficiency involved here, and that W. Alton Jones, Grace R. Doherty, and Charles A. Frueauff were the transferees of the assets of General Properties Co., which was, after such transfer, unable to pay the deficiencies. It fol-

---

[2] SEC. 730. CONSOLIDATED RETURNS.

\* \* \* \* \* \* \*

(b) REGULATIONS.—The Commissioner, with the approval of the Secretary, shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed, assessed, collected, and adjusted, in such manner as clearly to reflect the excess profits tax liability and the various factors necessary for the determination of such liability, and in order to prevent avoidance of such tax liability.

lows that W. Alton Jones, Grace R. Doherty, and Charles A. Frueauff are liable as transferees for the payment of the deficiencies herein.

Effect will be given in the computation under Rule 50 to the stipulation that petitioner is entitled to deduct in the computation of its income and excess profits taxes for 1940 the sum of $1,085.58 paid by it in 1940 for various state taxes; and $2,792.63 paid to the State of Indiana for gross income taxes in 1941 in the computation of its income and declared value excess profits taxes for 1941, and excess profits tax for the period January 1 to November 30, 1941; and the sum of $7,559.44 for organization and reorganization expenses in the computation of its 1941 tax liability; and that petitioner is not entitled to a deduction of $322.56 claimed by it for miscellaneous state taxes.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

LEECH, *J*., dissenting : The majority holds that the contributions to the employees' trusts were deductible as "compensation" under section 23 (a) of the Internal Revenue Code. I respectfully dissent.

The benefits of the trusts were to inure to the beneficiaries only because of the mutual relationship of employer and employee between those beneficiaries and the petitioner. The contributions to the trusts were, therefore, intended to be and were compensation to the employees. And, if not deductible as "compensation," they were not deductible under that section at all. *Monarch Life Insurance Co.*, 38 B. T. A. 801; [1] *Lincoln Electric Co.*, 6 T. C. 37 ; reversed, 162 Fed. (2d) 379.[2] See also section 23 (p). The applicability of section 23 (p) was not pleaded, discussed, or decided and could not, I think, possibly be involved. Admittedly, these contributions, if they had been made to "Employees' Trusts" as defined by section 165, "to cover  *  *  *  [a] pension liability accruing during the year," would have been deductible under

---

[1] An authority for the holding in this case is *United States* v. *Chase,* 135 U. S. 255, from which the following is quoted :

"It is an old and familiar rule that, 'where there is, in the same statute, a particular enactment, and also a general one, which, in its most comprehensive sense, would include what is embraced in the former, the particular enactment must be operative, and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment.' "

And, if this rule were not applicable in construing section 23 (a) (1) (A), I. R. C., "the particular enactment" therein covering "a reasonable allowance for  *  *  *  compensation  *  *  *" completely loses its effectiveness, and the right of the Commissioner to pass on the reasonableness of compensation payments in determining their deductibility under section 23 (a) (1) (A) is lost—a conclusion, I think, inconsistent with the law and its long consistent administration.

[2] It may be argued that, in this reversal, the Circuit Court of Appeals for the Sixth Circuit held that contributions to certain employees' trusts there were deductible as ordinary and necessary business expenses under section 23 (a) (1) (A), I. R. C., alone, regardless of whether these contributions were "compensation"—reasonable or unreasonable. If such an argument is sound, of course, that Circuit Court would disagree with the proposition for which the *Lincoln* case is cited above as an authority.

section 23 (a) (1) (A), as "compensation for personal services actually rendered." See sec. 23 (p). But there was here no "pension liability." And, more important, these trusts were not "Employees'. Trusts" within section 165. *Lincoln Electric Co., supra.* Regulations 103, sec. 19.165–1. Even the majority opinion does not so identify them. They were not part of any "plan" at all. The contributions in the taxable year were merely isolated transactions. They were made without any semblance of obligation for their continuance. Thus we are left, as the majority opinion reveals, with the naked question of whether these payments were deductible as "compensation for personal services actually rendered" under section 23 (a) (1) (A), *alone.*[3] The affirmative answer of the majority to this question is based upon the following simple ultimate conclusion of law and fact:

> The total compensation paid by petitioner in 1941 to each participant under the two trusts, including the amount credited to such participant under the trusts, constituted reasonable compensation for services rendered to petitioner in 1941 by each such participant.

Of course such conclusion, if supported by the law and the record, disposes of the issue respecting the contributions to the employees' trusts and their allocation to the participants therein. *Gisholt Machine Co.*, 4 T. C. 699. I am, however, unable to accept this conclusion. I believe it to be directly and conclusively contradicted by both the law and the record.

Section 23 (a) (1) (A), quoted in footnote 3 of the opinion, *supra*, limits the deduction of compensation payments thereunder to those made for "services * * * rendered." [Italics supplied.] So, in the *Lincoln Electric* case, *supra*, we held that, in order to be deductible as "compensation" under section 23 (a) (1) (A) the payments must have been made for *past* services. Since this conclusion was based on the direct holding of the Supreme Court in *Old Colony Trust Co.* v. *Commissioner*, 279 U. S. 716, nothing inconsistent therewith said by this Court in *Gisholt Machine Co., supra*, upon which the majority here primarily relies, or by any court other than the Supreme Court, could be effective.

The majority opinion includes the finding that the trust indentures contained among their provisions the following:

---

[3] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions :

(a) EXPENSES.—

(1) TRADE OR BUSINESS EXPENSES.—

(A) In General.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

* * * Payments to participating employees were to be made from each such allocated amount in the event the participant's salary and earned commissions for any fiscal year ending November 30 fell below 90 per cent of his average yearly salary and earned commissions for the preceding five years (or years of employment if less than five), in which event distribution was to be made to bring his compensation up to the 90 per cent level; * * *

Under this provision the employer could reduce salaries in any current year and make up the 90 per cent of the preceding five-year average from the trust funds contributed in a prior year, thus increasing its net income for such current year.

The employer, petitioner, had enjoyed very large profits during 1941, the year involved. Taxes were high. It sets aside in these trusts a portion of such profits. Under the last quoted provision of the trusts, it proposes to deduct as "compensation" under section 23 (a) (1) (A) of the code, *alone*, that portion of 1941 profits in computing its net income for 1941—and thus escape those high taxes thereon. It does this with the frankly stated purpose of using them in later years to pay compensation to employees for services rendered, not in the year of the contributions to the trusts and the allocation thereof to the employees, but for services rendered by the employees in those later years. This, I think, in itself prevents the contested deduction.

Another condition necessarily precedent to the right of an employer to a deduction for "compensation" under section 23 (a) (1) (A) of the code, *alone*, is that the "compensation" must have been irrevocably paid by the employer and irrevocably received by the employees.

Let us assume, contrary to the precise and deliberate wording of the trusts, that the contributions were to be used only for the payment of compensation for past services and, therefore, under *Gisholt Machine Co.*, 4 T. C. 699, upon which the majority relies, even though the trusts were not within section 165 of the code, the contributions, if reasonable, could legally be deductible as "compensation" under section 23 (a) (1) (A) alone. That assumption might support the premise that the present contributions when made and allocated were likewise deductible. I say "might" because it would do so only if the contributions were made irrevocably in the tax year, as they were in the *Gisholt* case. But that is not so here. The contributions now in dispute were revocable and not irrevocable at the close of the taxable year. That conclusion of law, it seems to me, inevitably follows from another equally clearly and precisely worded provision of the trusts. That provision, as the majority finds, was:

* * * The trust was irrevocable on the part of petitioner *except* that in the event the Commissioner of Internal Revenue ruled that the trust fund did not qualify under section 165 of the Internal Revenue Code, the petitioner reserved the privilege of electing to terminate the trusts upon giving notice to the trustees, who should then repay the fund to the company and all rights and obligations under the trusts should thereupon terminate * * * [Italics supplied.]

The determination of the validity of this provision here does not leave the pending controversy presenting only a moot question, as was so in *Commissioner* v. *Procter;* 142 Fed. (2d) 824. After answering the question of the validity of this provision here, we are still left with a live and continuing controversy, i. e., the tax deficiency. The provision expressly making the contributions to the present trusts revocable, I think, was valid. And, since the trusts obviously did not "qualify under section 165 of the Internal Revenue Code," a conclusion not disputed by the majority, the contributions were, therefore, not irrevocable, but revocable.

TURNER and OPPER, *JJ.*, agree with this dissent.