BENEFICIAL INDUSTRIAL LOAN CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7629. Promulgated October 23, 1946.

*J. R. Collins, Esq.,* for the petitioner.
*George J. LeBlanc, Esq.,* for the respondent.

ARUNDELL, *Judge*: Petitioner and its 250 odd subsidiaries availed themselves of the privilege conferred by section 730 (a) of the code to file a consolidated excess profits tax return for the calendar year 1940. In so doing they were required by statute to consent to all of the regulations promulgated by respondent under section 730 (b) and in effect on the last day prescribed by law for filing the return.

One of the regulations adopted by the respondent pursuant to section 730 (b) of the code is section 33.44 (b) of Regulations 110, which reads as follows:

SEC. 33.44. METHODS OF ACCOUNTING.

\* \* \* \* \* \* \*

(b) *Combination of methods.*

For the purpose of determining consolidated excess profits net income, if the members of an affiliated group have established different methods of accounting. each member may retain such method with the consent of the Commissioner, provided that the consolidated excess profits net income is clearly reflected, and, *provided further that intercompany transactions affecting consolidated excess profits net income, between members of the group shall be eliminated and adjustments on account of such transactions shall be made with reference to a uniform method of accounting,* to be selected by the members of the group with the consent of the Commissioner. [Italics supplied.]

For the taxable year 1940 the earned premium income of the insurance subsidiaries computed on the accrual method prescribed by section 204 of the code amounted to $2,112,009.55, while at the same time the deductions for premium expense taken by the loan subsidiaries on the cash basis amounted to $2,125,954.26. Because of the different accounting systems of the loan and insurance subsidiaries, these intercompany credit insurance transactions had the effect of reducing consolidated net income by the excess of the premium deductions over the premium income, or $13,944.71. Acting pursuant to the above quoted regulation, the respondent made adjustments reducing the premium deductions to $2,112,009.55 and restoring the excess of $13,944.71 to consolidated excess profits net income. In this manner the premium deductions were equalized with the premium expense, the consolidated excess profits net income was "clearly reflected," and the "intercompany transactions affecting consolidated excess profits net income" were eliminated. Petitioner makes no complaint as to these adjustments.

With respect to the base period years, the adjustments made by respondent were of exactly the same nature as those he made in the taxable year. In other words, he increased the consolidated income for the years 1937 and 1938 by the amount of the excess of premium deductions over premium income, and reduced the consolidated income for the years 1936 and 1939 by the amount of the excess of premium

income over premium deductions—a net reduction in the aggregate of $308,471.24. Thus, premium deductions were equalized with premium income throughout the base period years, and the intercompany transactions affecting consolidated excess profits net income in the base period years were thereby eliminated.

It is obvious, therefore, that the Commissioner has been consistent in his treatment as between adjustments made to the consolidated income of the taxable year before us and adjustments made to the consolidated income of the base period years. The first issue raised by petitioner, however, challenges the correctness of the Commissioner's adjustments made to the consolidated base period income.

Petitioner's first contention on this issue is that the item of $1,163,-521.04 credit insurance premiums paid by and allowed as deductions to the loan subsidiaries before January 1, 1936, is not an "intercompany transaction occurring during the base period" and hence is not subject to adjustment. This argument is premised on the mere fact that the premiums had been paid and deducted by the loan subsidiaries in 1935. Respondent answers that the act of making payment does not close the transaction, for the risk continues to be borne by the insurance subsidiaries which remain liable under their contracts during the succeeding years in the base period, and that accordingly these were "intercompany transactions occurring during the base period." Be that as it may, we think the petitioner's argument is of no particular moment and ignores the important factor, namely, the effect on consolidated excess profits net income in the base period. There is no doubt that the transactions whereby the insurance subsidiaries agreed for a cash consideration to indemnify the affiliated loan subsidiaries against loss of principal were intercompany transactions; there is likewise no doubt that such transactions, because of the combination of accounting systems employed by the affiliated corporations, affected the consolidated net income in the base period years. That is the factor which necessitates adjustment.

Petitioner next contends that the adjustments made by respondent to base period income had the effect of permitting a double deduction of the item of $1,163,521.04, first in 1935, and again in the base period years—which is said to violate section 33.44 (c) of Regulations 110, quoted in the margin.[1] This argument, we think, is equally without merit. Subsection (c) of section 33.44 makes no mention of intercompany transactions. It is concerned only, as its heading states, with

---

[1] (c) *Change to Accrual Method.*

In the case of a corporation which previously has reported its income * * * in accordance with a method other than the accrual method and is required under this section to report its income for the taxable year under the accrual method, * * * deductions which were properly included in the determination of net income under the method of accounting formerly followed shall not be allowed in the determination of net income for the taxable year of change or any subsequent year.

an instance in which a corporation which formerly reported its income on a different basis is required to report its income on an accrual method, and it provides for the proper treatment of items of income as well as deductions in making the change. It is an amplification of the general provisions contained in subsection (a) [2] to the effect that one member of the group will not be permitted to report income and deductions on the cash basis while another member reports the same items on an accrual basis. The provisions of subsection (a), however, are expressly made subject to the exceptions in subsection (b) relating to retention of a combination of accounting methods.

In arguing that the adjustments of the respondent have the effect of permitting a double deduction in violation of section 33.44 (c), petitioner proceeds upon the theory that all the loan subsidiaries were required to change to an accrual method of accounting. We do not understand that to be the case. It is true that in the prefatory portion of the deficiency notice there appears a statement to the effect that the income of the loan companies in base period years was computed on the accrual method to conform to the basis of computing the income of the other subsidiaries for those years. However, it appears that the real import of the statement was that adjustments had been made on account of the credit insurance premium transactions. The parties have stipulated that, for the purpose of computing the consolidated excess profits credit on the 1940 return, the petitioner *used the normal tax net income reflected in the separate income tax returns of the various subsidiaries for the base period years 1936 to 1939*. They have also stipulated that the loan subsidiaries' returns for those years were on a cash basis. A comparison of petitioner's computations of base period income in the consolidated return for 1940 with the respondent's computations of base period income in the deficiency notice reveals that the same figures were used for the normal tax net incomes of the various subsidiaries in the computations of both parties.

It is apparent, therefore, that respondent did not recompute the income of the various subsidiaries for base period years on an accrual method. This the parties have recognized by stipulating that the adjustments made by the Commissioner to equalize premium deductions with premium income for base period years "have the effect of reducing the *aggregate profit shown on the separate income tax returns of the*

---

[2] **(a)** *In General.*

For the purpose of determining consolidated excess profits net income, all members of the affiliated group shall adopt that method of accounting which clearly reflects the consolidated excess profits net income. A method of accounting which does not treat with reasonable consistency all items of gross income and deductions of the various members of the group shall not be regarded as clearly reflecting the consolidated excess profits net income. For example, one member of the group will not be permitted to report items of income or deductions on the cash method of accounting, while another member of the same group reports the same or similar items on the accrual method. The provisions of this paragraph are subject to the exceptions stated in paragraph **(b)**.

*various subsidiaries for the years 1936 to 1939, inclusive*, by the amount of $308,471.24." (Italics supplied.)

Thus, instead of the respondent's requiring a change of the loan subsidiaries' accounting method under section 33.44 (a) and (c) of Regulations 110, it appears that actually this is a case where respondent allowed the various subsidiaries to retain their combination of accounting systems under section 33.44 (b), with appropriate adjustments to eliminate the effect of intercompany transactions upon consolidated net income. That petitioner was not unaware of this fact further appears from the statement in its reply brief that "Both the petitioner-taxpayer and the respondent-Commissioner have agreed that each company retain its method of accounting with the one exception in the case of the loan subsidiaries; i. e., in the manner of reporting credit insurance premiums on a cash basis while the credit insurance subsidiary reports such credit insurance premiums on a Section 204 basis."

So, section 33.44 (c) has no application to the instant issue, and thus falls the basis for petitioner's argument in that connection. But a further difficulty with petitioner's position lies in the fact that, even if a change in accounting had been required so as to make section 33.44 (c) applicable, the same type of adjustment for which petitioner contends in respect of the first base period year, that is, reducing the loan subsidiaries' premium deductions (with corresponding increase in consolidated base period income) by the amount of deductions taken in 1935, would also have to be made in respect of the first excess profits tax taxable year, with the result that consolidated excess profits net income for 1940 would be greater than that determined by respondent, and it appears to us that the net effect would be disadvantageous to petitioner. Petitioner, however, has not suggested that such an adjustment should be made in consolidated income for 1940, and it has thus been inconsistent in the application of the method for which it contends.

Since, in the case of the excess profits credit computed under the income method, the average earnings or income of the base period years 1936 to 1939, inclusive, afford the measure for determining how much of the earnings or income an excess profits tax taxable year constitutes "excess" profits, consistency requires that the same type of adjustment made to consolidated net income for the excess profits tax taxable year also be made to the base period years, if the latter are to be a proper standard of comparison. Section 33.44 (b), which the respondent applied in adjusting the consolidated net income for 1940, is equally applicable with respect to corresponding adjustments required for base period years. Respondent has been consistent throughout in his treatment and has made the same type of adjustments to the base period income that he made to the income for 1940.

On the first issue we conclude that the respondent's adjustments were proper.

The second issue is whether recoveries in the net amount of $130,-785.90 on claims paid by the insurance subsidiaries prior to 1940 constitute "income attributable to the recovery of a bad debt" which, under section 711 (a) (1) (E) of the code, is to be excluded from excess profits net income for the taxable year 1940 "if a deduction with reference to such debt was allowable from gross income for any taxable year beginning prior to January 1, 1940."

Petitioner argues that the aggregate net income of the affiliated group for the four base period years was depressed by "bad debts" amounting to $5,422,131.04 (obviously referring to the aggregate deductions claimed in those years by the insurance subsidiaries for "losses paid" or "losses incurred"), and that there was income attributable to recoveries in 1940 of such "bad debts" in the amount of $130,-785.90. It also argues that the purpose of Congress in enacting the consolidated returns statute was to get a complete report on a "unitary business unit"; and that when the affiliated group of corporations is considered as a unit engaged in the small loan business, it is "preposterous" to say that the business unit had no bad debt.

Respondent's position is substantially the following: The recoveries of losses paid by the insurance subsidiaries constitute "salvage," within the meaning of section 204 (b) (6) of the code, which serves to reduce the amount of "losses incurred" during the taxable year. They are not recoveries of "bad debts." Section 33.31 (a) (12) of Regulations 110 provides that "the consolidated excess profits net income shall be the consolidated normal-tax net income increased or decreased, as the case may be, by the consolidated section 711 (a) adjustment"; and section 33.31 (a) (13) defines the consolidated section 711 (a) adjustment as "the net amount of the aggregate adjustments provided by section 711 (a) (1)  *  *  *  computed and determined in the case of each affiliated corporation  *  *  *  in the same manner and subject to the same conditions as if a separate return were filed  *  *  *." Then, he continues, the loan subsidiaries have no bad debt deductions because they are indemnified by the insurance subsidiaries; and when the insurance subsidiaries pay claims under their indemnity contracts, they obtain deductions, not for "bad debts," but for "losses incurred" as defined in section 204 (b) (6) of the code. Therefore, he argues that neither the loan subsidiaries nor the insurance subsidiaries would have deductions for bad debts in separate returns; that consequently neither would make recoveries of bad debts; and that the regulations prevent a different treatment in filing the consolidated return.

Respondent's argument is an extremely technical one, and to sustain it we should have to close our eyes to the practical aspects of the

situation. Furthermore, his position with respect to this issue is somewhat inconsistent with his treatment in connection with the first issue. There he looked upon the affiliated group as a single business unit and determined the true consolidated net income by making adjustments to eliminate intercompany transactions. Here, on the contrary, he seeks to break down the organization into its component parts, segregating the insurance subsidiaries and contending that what are for all practical purposes bad debts, are not "bad debts" after all but technically "losses."

The practical effect of the Commissioner's adjustments on the first issue, equalizing or eliminating the intercompany credit insurance transactions, is as if those transactions had never occurred. In other words, it is all the same as if the loan subsidiaries had not reduced their gross income by taking deductions for insurance premiums but had instead suffered and taken deductions for their own bad debt losses. In this consolidated organization, looked upon as a business unit, the use of intercompany credit insurance at all serves somewhat the same purposes as a bad debt reserve. Petitioner, indeed, has characterized the system as a sort of "glorified bad debt reserve."

The principal occupation of the affiliated group is the making of small loans. The business of the entire organization is concerned primarily with "debts." All other functions are subordinate and ancillary to that business. It can not be gainsaid that during the base period years the loan subsidiaries had loans outstanding or "debts" which became worthless. When some of the loans which had been charged off during the base period were later recovered in the taxable year, it requires no stretch of terminology to say that there arose "income attributable to the recovery of * * * bad debt[s]" within the meaning of the statute. Furthermore, the credit insurance dealt in by the insurance subsidiaries is by its very nature "bad debt" insurance. When, therefore, the insurance subsidiaries take deductions for claims paid, they are in reality taking deductions because of or on account of debts which have become worthless. Hence, it likewise requires no stretch of terminology to say that the deductions which the insurance subsidiaries take are deductions which are allowable "with reference to such debt[s]" within the meaning of the statute here under consideration.

We think the principles of our decisions in *J. F. Johnson Lumber Co.*, 3 T. C. 1160, and *Boyd-Richardson Co.*, 5 T. C. 695, are pertinent here. Those cases dealt with exclusions under section 711 (a) (1) (E) in the case of taxpayers using the reserve method of treating bad debts. It was there held that the taxpayers were entitled to exclude bad debt recoveries and that, in effect, when they had been allowed deductions in base period years for additions to their reserves, they were allowed

deductions "with reference to bad debts." In the *Boyd-Richardson* case we said:

The intent of Congress is not ambiguous. It did not want excess profits net income to include recoveries on bad debts, since they had no real relation to the operations of the current year, but represented earnings of a previous year for which there was no excess profits tax.

So here, the recoveries in question had no real relation to the operations of the consolidated group in the current year, but represented earnings of a previous year for which there was no excess profits tax. We think it an altogether immaterial circumstance that the recoveries were made in the first instance by the loan subsidiaries and thereafter turned over to the insurance subsidiaries pursuant to their contractual obligations.

On this issue we conclude that the express language of section 711 (a) (1) (E) is met and that the respondent's regulations do not prevent the relief which petitioner seeks. In the hands of the insurance subsidiaries these recoveries constitute income "attributable to" the recovery of bad debts "with reference to" which deductions had been allowed in the base period, notwithstanding the deductions might technically have been claimed under the designation of "losses incurred." In the recomputation, therefore, the sum of $130,785.90 should be excluded from consolidated excess profits net income.

Reviewed by the Court.

*Decision will be entered under Rule 50.*