GEORGE J. MEYER MALT & GRAIN CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 15852.    Promulgated September 27, 1948.

*Robert J. Bird, Esq.*, and *H. A. Mihills, C. P. A.*, for the petitioner.
*Harold D. Thomas, Esq.*, for the respondent.

## OPINION.

HARLAN, *Judge*: Petitioner, in the excess profits tax returns involved herein, claimed that certain deductions taken in the base period

were abnormal and computed its excess profits credit accordingly. The respondent rejected all of these claimed abnormal items. This controversy between the parties turns upon section 711 (b) (1) (J) and (K) of the Internal Revenue Code, the relevant portions of which are set forth in the margin.[1]

The first deduction for our present consideration, which petitioner took in 1940 because of an alleged bad debt and which it now seeks to have disallowed, is the claim against the Poth Brewing Co. for $65,000. The petitioner now contends that that deduction was improper because there was no identifiable event in the fiscal year 1940 which showed that the claim against the Poth Brewing Co. was valueless. This company did not go into bankruptcy until February of 1941, and during 1941, 1942, and 1943 petitioner actually recovered payments in excess of $4,000 to apply on its claim against the Poth indebtedness.

Petitioner's only witness on this point was its bookkeeper at the time and prior thereto when the 1940 return was made. This witness said that during 1940 the taxpayer had employed an attorney to force the collection of this claim; that the attorney was exerting pressure on the debtor and endeavoring to force it into bankruptcy; and that the attorney was in constant touch with the officers of the corporation concerning the condition of the claim.

The income tax return was signed by the president, the treasurer, and the accountant who prepared the return, none of whom were called

---

[1] SEC. 711. * * *

* * * * * * *

(b) TAXABLE YEARS IN BASE PERIOD.—

(1) GENERAL RULE AND ADJUSTMENTS.—The excess profits net income for any taxable year subject to the Revenue Act of 1936 shall be the normal-tax net income, as defined in section 13 (a) of such Act; and for any other taxable year beginning after December 31, 1937, and before January 1, 1940, shall be the special-class net income, as defined in section 14 (a) of the applicable revenue law. In either case the following adjustments shall be made (for additional adjustments in case of certain reorganizations, see section 742 (c)):

* * * * * * *

(J) Abnormal Deductions.—Under regulations prescribed by the Commissioner, with the approval of the Secretary, for the determination, for the purposes of this subparagraph, of the classification of deductions—

(i) Deductions of any class shall not be allowed if deductions of such class were abnormal for the taxpayer, and

(ii) If the class of deductions was normal for the taxpayer but the deductions of such class were in excess of 125 per centum of the average amount of deductions of such class for the four previous taxable years, they shall be disallowed in an amount equal to such excess.

(K) Rules for Application of Subparagraphs (H), (I), and (J).—For the purposes of subparagraphs (H), (I), and (J)—

* * * * * * *

(ii) Deductions shall not be disallowed under such subparagraphs unless the taxpayer establishes that the abnormality or excess is not a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, and is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer.

(iii) The amount of deductions of any class to be disallowed under such subparagraphs with respect to any taxable year shall not exceed the amount by which the deductions of such class of such taxable year exceed the deductions of such class for the taxable year for which the tax under this subchapter is being computed.

as witnesses by the taxpayer, nor was their absence explained. They were the individuals who were being advised by the company attorney and were the ones who passed upon the worthlessness of the claim. We, therefore, can not accept the statement of the bookkeeper that there was some doubt about the worthlessness of the claim when it was charged off as a bad debt because there was a possibility of the debtor procuring a loan. If this were true, the officers of the company who made the income tax return did not correctly represent the facts in that return and in the absence of their testimony we would hesitate to come to this conclusion. The fact that some payments were received on this debt in the ensuing three years does not argue against its worthlessness when charged off, as the World War, which commenced in 1941, in a number of instances made assets theretofore worthless of some substantial value.

It is therefore our conclusion that petitioner has not established from all of the evidence and the record that the claim against the Poth Brewing Co. was not totally worthless when it was claimed to be so in petitioner's 1940 return.

Petitioner contends that bad debts in the amount of $85,000 of Forest City Brewing Co. and Poth Brewing Co., deducted in 1940, were abnormal as to class.

In its 1940 return petitioner claimed and was allowed a bad debt deduction growing out of the worthlessness of a chattel mortgage for $20,000 and a second mortgage for $65,000 given by Forest City Brewing Co. in 1938 when its account with the taxpayer had gotten into arrears. These two mortgages were the only mortgages accepted by the taxpayer from its customers. All other credits were for cash or property, such as the receipt in 1938 of the common stock of Forest City in the amount of $26,000. Petitioner contends that these mortgages were treated by it in its bookkeeping processes as a capital asset, inasmuch as when the second mortgage was received it was debited to the "Forest City Second Mortgage" account. The record is not clear as to just how the chattel mortgage was handled. However, when on the stand, the only witness for the petitioner said that after the mortgages were received the petitioner considered that the customer "still owed the debt."

Furthermore, the taxpayer in 1940, when its return was filed, did not treat these mortgages as capital assets, and it is evident that the question must have been under discussion because the taxpayer, in its 1940 return, did attempt to obtain a deduction for an additional $26,000 owed by Forest City, because of which Forest City had delivered to the taxpayer $26,000 of its common stock. The Commissioner disallowed the deduction for reasons not set forth in the record, but obviously because the stock received amounted to a capital asset.

These mortgages were not received by the petitioner as the result of a loan of petitioner's capital. They were received as additional security for a debt which arose in the regular course of trade, just as the other debts which petitioner charged off as bad debts in 1938 and 1940 also arose.

The facts in this case distinguish it from *Green Bay Lumber Co.*, 3 T. C. 824, where this Court held that all bad debts do not necessarily fall within the same classification where their origin and the purpose of their creation were basically different. In that case the taxpayer had loaned money to its employees to buy stock in another corporation. This transaction was unique in the taxpayer's business and was so dissimilar to its other transactions that when the notes were unpaid the Tax Court held that the bad debt loss resulting was in a class abnormal to the taxpayer, to be eliminated from its base period income tax computation.

In the case at bar, the debts of Forest City arose in the course of trade just as did the taxpayer's other debts.

The petitioner also cites *Rockford Varnish Co.*, 9 T. C. 171, where the taxpayer in 1933 and in 1936 accepted from two customers notes in payment of an account of very long standing on its books and thereafter received payments from the customer which it credited on the notes. In 1943 it sold the notes and sought a 100 per cent loss deduction on the loss sustained, on the ground that the sale constituted a sale of property held primarily for sale to customers in the ordinary course of its trade or business. The Court held that the taxpayer was not in the business of buying and selling notes; that it had treated the notes over a long period of time as capital assets; and that the sale thereof in 1943 resulted in a capital loss. There is almost nothing in common between the facts in that case and those in the case at bar.

Petitioner also relies on *Kansas City Structural Steel Co.*, 9 T. C. 938, in which the taxpayer, engaged in the fabrication and erection of structural steel, in order to avoid a business loss, went into an entirely different business and claimed the loss resulting therefrom to be abnormal for the purpose of the computation of its base period income. The Court held that this loss was in a class by itself and wholly abnormal to petitioner and should be disallowed.

It is therefore our conclusion that the bad debt losses deducted by petitioner in its 1940 return growing out of the worthlessness of the Forest City mortgages were not abnormal as to class. See *Arrow-Hart & Hegeman Electric Co.*, 7 T. C. 1350; *Tovrea Land & Cattle Co.*, 10 T. C. 90; and *Oaklawn Jockey Club*, 8 T. C. 1128.

In 1939 petitioner paid $10,000 to its tax counsel to represent it in a tax claim growing out of an attempted enforcement of section 102

of the code. The petitioner contends that, since it was a manufacturing corporation and not a holding company, it could not reasonably expect to be taxed under section 102 and that therefore the expense attendant upon the successful defense of such a proceeding is abnormal as to class.

Petitioner's argument herein is somewhat difficult to follow, inasmuch as any corporation, regardless of its principal objective, could well be used as a means of "preventing the imposition of the surtax upon its shareholders," and section 102 is very broad in describing the type of corporations covered. However, accepting petitioner's position for the purpose of discussion, nevertheless the expenditures involved were not paid out in satisfaction of any claim which was unusual in character. The $10,000 involved was paid for "legal and professional services" in connection with tax controversies, and amounts had been paid by the petitioner for similar services to the same accounting firm during every year from 1934 to 1940, inclusive. It is true that these amounts varied. In 1935 it was $8,570.16; in 1939. $12,250; and in 1940, $2,500. If this Court were to exclude legal and professional fees because of the fact that during a particular year they were paid for services rendered in connection with a section of the revenue law not covered by prior services, we would soon have a completely unwieldy number of classifications for the purpose of computing base period net income.

In *City Auto Stamping Co.*, 7 T. C. 354, the taxpayer therein, which was a manufacturing company, had become involved in suits of a character wholly to be unanticipated by such a corporation, and in one year it had paid out $300,000 and in another $70,000 in settlement of this litigation. The Court held that such unusual payments were abnormal to the taxpayer, but it is to be noted that there was no finding that the amount paid out for legal and professional services in the handling of this litigation was abnormal as to class.

It is therefore our conclusion that the $10,000 paid by petitioner in 1939 for legal and professional services is not an improper deduction in considering base period income because of being abnormal as to class.

The testimony herein presents a serious factual problem relative to the abnormality in amount of the "dues and subscriptions" paid by the taxpayer in 1939. The stipulations give us no help as to what items were included in this classification and taxpayer's only witness was a man who, in 1939, was its bookkeeper. This witness testified that a firm of auditors, at the end of the fiscal year, audited the company's books and broke down the "general" expense account into various accounts, one of which was called "advertising," in which was included

all items which the auditors allocated as "dues and subscriptions" in preparing petitioner's income tax returns. The witness himself did not handle this division of the ledger accounts, nor did he prepare or sign the income tax returns. His testimony on this point is of such a vague character that the Court is uninformed whether or not the allocation in 1939 included items other than dues paid to the Maltsters Association; or whether or not the 1939 total included the cash items paid out during that year and ignored the unpaid balance due on the dues to the Maltsters Association.

This witness, however, did testify positively as to two relevant facts which would be within his personal knowledge. He testified as to the rates of dues to the Maltsters Association per 1,000 bushels of barley processed, and also that the taxpayer processed approximately its capacity of 2,500,000 bushels of barley each and every year. He, as the bookkeeper, would, of course, handle the invoices and enter the receipts and disbursements. He was therefore in a position to know the rates of dues and the amount of barley annually processed. His manner was frank and he was not evasive. We accept as true his testimony on those points within his personal knowledge. When we apply his statements as to plant capacity to the rate of dues in the Maltsters Association and the amount included in the dues and subscriptions allocation, it becomes evident that in all years except 1939 the dues and subscriptions allocation must have contained items other than dues to the Maltsters Association, while in 1939 the disbursement is not large enough to cover the Malsters Association dues alone for that year.

Nevertheless, the amount included in this allocation in 1939 did exceed 125 per cent of the average disbursements in the same class in the previous four taxable years and in our opinion such increase was not due to any of those causes set forth in section 711 (b) (1) (K) (ii). It was directly due to increased costs incurred by the Maltsters Association, not particularly in the interest of the taxpayer, but in the interest of all the maltsters in the United States. The evidence discloses that this increase in dues was not caused by a change in the business of the taxpayer. The computation of this disallowance will be made under section 711 (b) (1) (K) (iii).

The above discussion brings us to the alternative issue relating to abnormalities in amount in connection with the 1940 bad debt deduction and the deduction for professional services. The petitioner urges that, if these deductions be not disallowed as abnormal in class, they should, in the alternative, be considered as excessive in amount, since in the years in which they were taken the class to which the respective deductions belonged exceeded the average amount of such deductions

for the four years prior to the years in which they were taken by an amount in excess of 125 per cent.

The Commissioner contends that they should not be considered as excessive because the taxpayer has failed to show that the excess was not the consequence of an increase in its income, a decrease in the amount of some other deduction, or of a change in the type, manner of operation, size, or condition of the business engaged in by the taxpayer.

Our favorable evalution of the testimony of the taxpayer's witness on all matters within his personal knowledge leads us to conclude that the base period deductions which we have heretofore refused to disallow as abnormal as to class should be considered as excessive in amount within the purview of section 711 (b) (1) (J) (ii). In our opinion the taxpayer has established that such excess is not a consequence of an increase in its gross income, a decrease in the amount of some other deduction, or of a change in its business processes. The Commissioner argues that, since the gross amount paid by the taxpayer as dues and subscriptions, when divided by the rate per 1,000 bushels of barley processed, shows that there was a considerable variation in the amount of barley processed and that the taxpayer has not shown that the abnormal size of the various deductions was not due to this variation. We can not accept this argument of the Commissioner as against petitioner's positive oral testimony that the annual quantity of barley processed was constant and that the fluctuations in the dollar value of net sales, the cost of goods sold, and the gross income from sales were all dependent upon the price of barley, and the accuracy with which the taxpayer, in the fall, could forecast that price for the ensuing year. During the period involved the country experienced a drought and the beginning of the World War, both of which seriously interfered with that accuracy in prophesying barley prices and consequently created variations in the taxpayer's sales value, income, and profits. From all of the evidence, we can see no direct causal connection between such variations and the bad debt deduction or the deduction for professional services. In fact, the largest credit sales to Forest City, which provided the bad debt deduction in 1940, occurred in 1935, 1936, 1937, and 1938, when petitioner's gross income from sales was growing progressively less. In 1938, when the largest credit sales occurred, the net sales of the taxpayer were lower than in any of the previous four years.

Poth Brewing Co.'s largest credit purchases occurred in 1936, 1937, and 1938 and its largest single credit purchase year was 1938, when the taxpayer's net sales were low. We can find no casual connection between the deduction of these bad debts in 1940 and the amount of sales or profits in that year, as the debts were deducted in the year in which the taxpayer ascertained them to be worthless under the provisions of section 22 (k) (1) of the code as it existed in 1940.

The taxable years involved in the litigation which caused the deduction of $10,000 for legal and professional services in 1939 were 1936 and 1937. These years were not far from average in the financial experience of petitioner in the period from 1934 to 1940. The excess of all of these deductions over the previous four-year average for their respective classes should be computed in determining the excess profits tax credit as provided for in the code.

Petitioner's returns for 1943 and 1944 claimed adjustments for abnormal deductions of bad debts for 1938 and 1940. Its excess profits credit was computed under the income method and by the use of the growth formula provided for by section 713 (f) of the code. The Commissioner refused to recognize the abnormality of all of these bad debt deductions, either as to class or as to amount. In the pending proceeding no error is claimed because of the refusal of the Commissioner to disallow the bad debt deductions for the year 1938. Petitioner complains only of the refusal to disallow the bad debt deductions for 1940. The operation of the growth formula gives the taxpayer a tax advantage if the excess of the deduction for 1940 be disallowed and the excessive deduction for 1938 be retained in the computation of the base period excess profits credit.

The stipulations introduced into this case by both parties, and the evidence introduced by the taxpayer have demonstrated satisfactorily to this Court that from 1934 to 1940, inclusive, there was no material change in the annual quantity of barley processed and marketed or in the methods of the processing and merchandising, and that there was no plant expansion and no additional products were manufactured or sold. The testimony also establishes that none of the bad debt deductions were a consequence of a decrease in the amount of any other deduction claimed or of any increase in the income of the taxpayer during that period.

In his answer herein the Commissioner argues that if the 1940 bad debt deductions are disallowed, the 1938 bad debt deductions should also be disallowed. In *Colson Corporation*, 5 T. C. 1035, the taxpayer had computed its base period excess profits credit on the income method by the use of the growth formula. Its computation, however, disclosed an abnormal bad debt deduction for the year 1936, which the Commissioner on his own volition disallowed and which materially affected the computation under the growth formula. This Court held that under section 711 (b) (1) (K) (ii) it was not the privilege of the Commissioner to make disallowances in a case where the petitioner had not established the fact that the particular deduction should be disallowed.

In the *Welch Grape Juice Co.*, 9 T. C. 786, the taxpayer had filed a petition claiming error in the refusal of the Commissioner to disallow a number of claimed abnormal deductions throughout the base period. These deductions covered 13 different classifications. In an amended petition the taxpayer withdrew its objection to all of the claimed abnormal deductions in the year 1936 and to all but one in the year 1937, and claimed error only in the refusal to disallow deductions in 5 of the original 13 classifications and only one of those 5 classes covered deductions in any year except the last two years of the period. In the trial of the case the petitioner introduced no evidence as to the deductions which it claimed to be abnormal except those deductions which it asked the Court to disallow. In the one case involving abnormal deductions for money expended for trade-marks for which disallowances were asked in 1937 and 1938, it introduced evidence, showing that in this one classification the deductions were abnormal in both of these years. In that case this Court held:

> Section 711 (b) (1) (J) is a remedial statute and the taxpayer has the burden of showing that the relief which he claims comes within the purview of that section as limited by section (K), but we find nothing in either the statute or the regulations promulgated thereunder which places on him the burden of proving that there are no other deductions in any of the base period years which might be disallowed as abnormal within the meaning of the statute. We find nothing in section 711 (b) (1) (J) to indicate that it is to be applied differently when 713 (f) is applicable.

However, the case at bar is clearly distinguishable in our opinion from the two cases above. In the pending case the taxpayer has met the burden of proof which section 711 (b) (1) (K) (ii) imposes upon it. It relies upon that section for the disallowance of excessive bad debt deductions, and, after that has been done by the taxpayer and the evidence is before the Court, we feel that it would be mocking the intent of Congress in the passage of section 713 of the code to permit the taxpayer to claim a growth in his base period income in excess of the growth which the testimony which the taxpayer itself has introduced shows clearly to be the reality. The wording of section 713 (f) indicates clearly on its face that its purpose is to protect from injustice corporations whose business during the base period was in an expanding condition prior to the period when World War conditions caused a general expansion in all business. The excess profits tax law itself was intended, of course, to impose an additional tax burden on swollen profits occasioned by war conditions. It was not designed to penalize businesses whose profits were growing prior to the war period and due to conditions not arising out of the war. The report of the Congressional committee on this section makes its purpose doubly clear:

> Relief is provided for corporations that experienced *rapid growth* during the base period. Under existing law, only the average experience during those

years can be counted in determining the excess-profits credit based on income. *Corporations whose facilities and production capacities were substantially increased* during this period would thus be penalized as compared to corporations which had already achieved and maintained a high and constant level of production. The bill will give effect *to the ratio of increase* during those years. This treatment will afford a substantial advantage *to these expanding companies* as compared with the use of the level average now required. [Emphasis supplied.]

An examination of the net sales and the gross income of the taxpayer herein shows that as a matter of fact it was not an expanding industry during the base period years. We feel that this Court would be wholly unwarranted therefore in permitting this taxpayer to procure a disallowance of an abnormality in amount of the deduction for bad debts in 1940 and to refuse to accept a disallowance of an abnormality in amount of a deduction for bad debts in 1938, which is in exactly the same classification. Section 711 (b) (1) (K) (ii) does not require that the taxpayer *seek* the disallowance of the deduction. All that section requires is that the taxpayer establish the abnormality in amount of the deduction by evidence. This the taxpayer has done in the case at bar, and section 711 (b) (1) provides that when the statutory conditions are fulfilled "adjustments *shall* be made."

It is therefore our conclusion that in computing the excess profits tax credit the abnormality in the amount of the bad debt deduction for 1938 should be disallowed, as provided for in the code.

Reviewed by the Court.

*Decision will be entered under Rule 50.*