GREAT AMERICAN INDEMNITY COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 31086.   Promulgated November 12, 1952.

_____

Paul R. Russell, Esq., for the petitioner.
Michael Waris, Jr., Esq., for the respondent.

OPINION.

MURDOCK, *Judge:* Insurance companies, other than life or mutual, are taxed in accordance with the special provisions of section 204. One of the deductions allowed is for losses incurred as defined in subsection (b) (6). That subsection is as follows:

LOSSES INCURRED.—"Losses incurred" means losses incurred during the taxable year on insurance contracts, computed as follows:

To losses paid during the taxable year, add salvage and reinsurance recoverable outstanding at the end of the preceding taxable year, and deduct salvage and reinsurance recoverable outstanding at the end of the taxable year. To the result so obtained add all unpaid losses outstanding at the end of the taxable year and deduct unpaid losses outstanding at the end of the preceding taxable year;

The deduction for losses incurred taken by this petitioner on its 1939 return, in the computation of which the $135,001 amount involved herein was used, was taken under those provisions of section 204. The record does not show just why the petitioner chose the amount of $135,001 in setting up the reserve in 1939 to cover the loss which it anticipated on the O'Connor surety bond. It contends that the deduction of that amount in 1939 was in a class by itself and was abnormal within the meaning of section 711 (b) (1) (J) (i). No one has attempted to state any general rule for classifying deductions for that purpose and no prior decision, close enough to be helpful here, has come to light. This issue must be considered and decided on the facts presented.

The combination of such a large deduction taken in the base year 1939 and an even larger offsetting restoration to income in the excess profits tax year 1944, in which the actual liability, if any, was settled by payment of $26,621, is an unfortunate one for the petitioner. However, this Court has no authority to grant relief except in cases coming within the statutory provision. Furthermore, the deduction and the inclusion were within the special method of reporting permitted taxpayers like this one and it is not clear that the system as a whole worked any hardship upon the petitioner. Nevertheless, the petitioner is entitled to any relief for which it qualifies under section 711 (b) (1) (J).

It is proper to consider the circumstances which gave rise to the deduction. But unusual features of the bond or of the risk are not particularly significant except as they have some bearing upon the deduction itself and tend to make it abnormal. The petitioner discusses various allegedly unusual features of the bond and of the risk which do not appear to have led to the deduction or the loss and for that reason seem immaterial to the decision of this issue. The petitioner argues, for example, that mere size is some justification for separate classification of this deduction. That entire line of reasoning lacks persuasiveness in view of the fact that section 711 (b) (1) (J) (ii) is especially designed to give relief where a deduction is abnormal in amount. A Congressional intent to have the application of section 711 (b) (1) (J) (i) also depend upon size is not readily apparent. Cf. *Tovrea Land & Cattle Co.*, 10 T. C. 90. There is evidence that the petitioner made some effort to limit its risks to $50,000, but any such practice was not closely followed. The facts that a printed form was not used but, instead, the bond was especially drafted, that it covered performance and payment, and that the city was protected prior to those entitled to payment, do not justify separate classification of the 1939 deduction. It does not appear that any of those characteristics of this bond bears any close or significant relation to the deduction taken in 1939 which would lead to the separate classification of that amount as an abnormal deduction.

Likewise, the cause of the loss is a poor basis for separate classification of the 1939 deduction as an abnormal one. The business of this petitioner was to take risks for a fee in order to protect others. Its success depended upon knowing what risks it was taking. It tried to calculate its risks and charge accordingly so that the total charges would exceed the eventual losses. The purpose of this particular bond was to protect the city from loss or damage up to $1,735,000 suffered by reason of any failure of O'Connor to carry out its contract, and, secondly, to guarantee that O'Connor would pay for materials and labor used in performing the work. O'Connor was to construct concrete columns down to bed rock upon which the building was to rest. An important factor to all concerned, including the petitioner, was the kind of substance which had to be penetrated in order to have the columns reach bed rock. O'Connor defaulted because that overburden was not what it expected. The possibility that that overburden might present difficulties was one of the risks inherent in the piece of business which the petitioner accepted by joining in the bond and accepting a fee for taking all such risks. Overlooking that possibility in construction work below ground or water level would be inexcusable in the case of a surety and the petitioner undoubtedly considered it. Borings were made to determine the character and con-

dition of the overburden, but for some reason not disclosed by the record those borings were inadequate. However, the presence of rocks and water in the overburden, which made the work so difficult and expensive, is not shown to be so unusual, unforeseeable, or unpredictable, had proper investigation been made, as to justify separate classification of the 1939 deduction as abnormal within the meaning of section 711 (b) (1) (J) (i). The default of O'Connor caused the petitioner to set up a reserve and take a deduction in 1939, but the ultimate cause of the loss to the petitioner was its decision, along with the other sureties, to compromise, rather than risk a possible appeal from a court decision in their favor. Perhaps the most abnormal thing about the 1939 deduction of $135,001 may have been its excess over the ultimate loss, but section 711 (b) (1) (J) grants no relief for that kind of an abnormality.

Differences between the risks taken by the petitioner on different business are apparent, but every difference in risk, in cause of loss, or in some other circumstance to which the petitioner can point, does not justify a separate classification of a deduction for the purpose of section 711 (b) (1) (J) (i). The Commissioner would place all of the deductions of the petitioner based upon entries in its reserve accounts in but one class. That may be too narrow a view. Nevertheless, the record not only fails to show that all other deductions taken by the petitioner can be distinguished for present purposes from the 1939 deduction of $135,001, but it shows, on the contrary, that the petitioner was entitled, or may have been entitled, to take other deductions, even some larger ones, which would seem to fall into the same class as this one. No sufficient reason, or combination of reasons, for classifying this deduction separately for the purpose of section 711 (b) (1) (J) (i) appears here despite careful study of the record and of the arguments of the petitioner. If this particular deduction is so different from all usual deductions in the history of the petitioner as to justify separate classification for the purpose of this Code provision, this Court is unable to describe that difference.

The petitioner contends, as a rather secondary alternative, that all deductions based upon surety bonds accounted for under the Towner Rating Bureau Code No. 367 should be classified separately for the purpose of section 711 (b) (1) (J) (ii). Accounting practice is of some significance under the Treasury Regulations pertaining to this section, cf. *Tovrea Land & Cattle Co., supra,* and undoubtedly the classification of accounts prescribed by Towner was important for some purposes. It enabled studies to be made in fixing rates, it may have helped to show the petitioner the relation of charges to risks under bonds which differed in some particulars from each other, and it may have had other advantages. Still it does not appear that every

Towner Code number, or this one in particular, should be the basis for a separate classification of deductions for the purpose of section 711 (b) (1) (J) (ii). These code numbers have been increased by subdivision in the past and the process may continue for reasons sufficient to the bonding companies, Towner, and the state authorities. Yet it does not necessarily follow that those reasons have any relation to classifications for the purpose of section 711 (b) (1) (J) (ii). Cf. *George J. Meyer Malt & Grain Corporation*, 11 T. C. 383, in which at page 392 reference was made to "unwieldy number of classifications." The Court has been told only superficially, for example, how "Other Public and Private Contracts (Except Federal), Other Construction: All Others," which describes Towner Code No. 367 contracts, would differ from "Federal Contracts, Other Construction: All Others" or from contracts classified under other code numbers as, for example, 357 through 362 and the corresponding code numbers for similar Federal contracts, and it does not know how the differences, whatever they are, would justify separate classification of deductions relating to those contracts for the purposes of section 711 (b) (1) (J) (ii). There is the possibility that underground rocks or water might be encountered in the course of construction in all contracts mentioned in those classifications, so the different classes could not be distinguished satisfactorily on that basis.

The petitioner makes no claim that any other classification would bring it relief and no other classification which would bring it relief is apparent from the record.

The remaining contention of the petitioner is that it is entitled to exclude certain amounts from excess profits net income for the years 1940 through 1943 under section 711 (a) (1) (E). The excess profits net income for those years is the normal-tax net income with adjustments, one of which is covered by (E), entitled "Recoveries of Bad Debts." It provides "There shall be excluded income attributable to the recovery of a bad debt if a deduction with reference to such debt was allowable from gross income for any taxable year beginning prior to January 1, 1940." The parties have stipulated that the petitioner paid various sums during the years 1936 to 1939 inclusive in settlement of claims of those insured by it and effected collections, called "salvage," during the years 1940 through 1943 on account of those same claims in the total amount of $101,561.93. Those are the amounts which the petitioner seeks to exclude as "recoveries of bad debts for prior years."

The petitioner did not set up an account receivable from the principal when it was required to meet a loss insured by it and it set up no account to show income due from salvage until salvage was actually received, except in a few instances in which it definitely knew at the

end of a year that it would be able to recover some amount as salvage in a subsequent year. The record does not show that any amount due the petitioner which it collected as salvage during the taxable years was ever a part of a worthless debt. The petitioner never took any deductions for worthless debts in connection with these items and none was allowable. It took deductions for losses incurred on policy contracts and the salvage represented recoveries of a part of those amounts deducted as losses. Thus, the amount which the petitioner seeks to exclude does not represent the recovery of a bad debt with reference to which a deduction was allowable from gross income for any year prior to January 1, 1940.

The petitioner did not know what amount, if any, might be collected from the principal at the time it claimed the deductions for anticipated losses against which it had insured. The deductions were allowable as amounts were entered in the reserve for anticipated losses without regard to or consideration of any possible recovery of salvage from the principal or otherwise in a later year.[1] A proper investigation might have disclosed at the time the deduction was taken that these salvage recoveries would be made. Thus, the recoveries may have been of good debts rather than of bad debts. Furthermore, there is evidence that "salvage" is not limited to recoveries from defaulted principals and it is not clear that the amounts in question were all recoveries from principals. Although, as the petitioner claims, there may be some similarity between the "salvage" which it recovered as a normal incident of its business and the recovery of bad debts which Congress has excluded, nevertheless its salvage may not be excluded since it does not come within section 711 (a) (1) (E).

The petitioner quotes extensively from and places considerable reliance upon the case of *Beneficial Industrial Loan Corporation*, 7 T. C. 1019, but that case is distinguishable upon its facts. The petitioner filed a consolidated excess profits tax return for 1940 in which about 256 subsidiaries joined. The principal business of the group was the making of small loans from which innumerable "bad debts" developed. Two of the subsidiaries insured the loans for the lenders and paid the lender for any part of a loan which was not collected. The insurer thereafter sometimes made some recoveries on the unpaid debts. This Court held that those recoveries, although salvage on losses deducted by the two insurance companies, were excludible under section 711 (a) (1) (E) as recoveries of bad debts, considering the consolidated group as a business unit, engaged in the small loan business. The facts in the present case do not present such a situation.

*Decision will be entered for the respondent.*

---

[1] Section 204 (b) (6) requires that salvage recovered in the year of the deduction must be subtracted in computing the deduction.