THE QUAKER OATS COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 48679.    Filed June 11, 1957.

*Harry B. Sutter, Esq., Peter L. Wentz, Esq., William P. Sutter, Esq., Merrill E. Olsen, Esq., W. McKenzie Mothersill, Esq.*, for the petitioner.

*George T. Donoghue, Esq.*, for the respondent.

628

632

634

638

OPINION.

HARRON, *Judge:* The questions to be decided involve application of the provisions of section 711 (b) (1) (J), 1939 Code.[3] Petitioner

---

[3] SEC. 711. EXCESS PROFITS NET INCOME.

(b) TAXABLE YEARS IN BASE PERIOD.—

(1) GENERAL RULE AND ADJUSTMENTS.—The excess profits net income for any taxable year subject to the Revenue Act of 1936 shall be the normal-tax net income, as defined

made payments in its base period years for various retirement benefits. The problem is the classification of these payments under the provisions of section 711 (b) (1) (J), so that adjustments of petitioner's excess profits net income for each of the base period years may be properly computed.

Section 711 (b) (1) (J) was intended to be, and is, a remedial statute. The legislation of which this section is a part "attempts to provide, both by specific terms and in carefully guarded general terms, a set of flexible rules which should alleviate at least the bulk of the severe hardship cases which may arise." Report of the Committee on Ways and Means, H. Rept. No. 146, 77th Cong., 1st Sess. (1941). It must, therefore, be given a reasonable and rational construction in order that it may provide the intended relief. *Bonwit Teller & Co.* v. *United States*, 283 U. S. 258; *Green Bay Lumber Co.*, 3 T. C. 824.

The prime object of the various sections of the statute is to ascertain and tax excess profits. The ascertainment of excess profits involves a comparison based either upon petitioner's income experience during a prior test period, or upon its invested capital, according to whichever method of computation results in the lesser tax. Sec. 712 *et seq.*, 1939 Code. In petitioner's case, the computation based on income results in the lesser tax. Thus, the comparison is with the average income for a 4-year period. The excess profit is computed after giving "excess profits credit" for 95 per cent of the average base period net income as finally ascertained. Sec. 713 (a) (1) (A).

in section 13 (a) of such Act; and for any other taxable year beginning after December 31, 1937, and before January 1, 1940, shall be the special-class net income, as defined in section 14 (a) of the applicable revenue law. In either case the following adjustments shall be made * * *:

\* \* \* \* \* \* \*

(J) Abnormal Deductions.—Under regulations prescribed by the Commissioner, with the approval of the Secretary, for the determination, for the purposes of this subparagraph, of the classification of deductions—

(i) Deductions of any class shall not be allowed if deductions of such class were abnormal for the taxpayer, and

(ii) If the class of deductions was normal for the taxpayer, but the deductions of such class were in excess of 125 per centum of the average amount of deductions of such class for the four previous taxable years, they shall be disallowed in an amount equal to such excess.

(K) Rules for Application of Subparagraphs (H), (I), and (J).—For the purposes of subparagraphs (H), (I), and (J)—

\* \* \* \* \* \* \*

(ii) Deductions shall not be disallowed under such subparagraphs unless the taxpayer establishes that the abnormality or excess is not a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, and is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer.

(iii) The amount of deductions of any class to be disallowed under such subparagraphs with respect to any taxable year shall not exceed the amount by which the deductions of such class for such taxable year exceed the deductions of such class for the taxable year for which the tax under this subchapter is being computed.

In short, the statute provides for the determination of the average base period net income, a 95 per cent credit based upon that average, and the tax on the excess profit.

The taxable years here are fiscal years ended on June 30, 1943 and 1944; the base period years are 1936 to 1939, inclusive.

In order to arrive at an equitable computation of excess profits, a fair average for the base period income must be ascertained. This is done by first computing "the excess profits net income" for each of the base period years; then certain adjustments may be made if they are permissible. We are concerned here with problems about two adjustments, those described in section 711 (b) (1) (J) (i) and (J) (ii). These adjustments provide relief by eliminating certain abnormalities.

Subsection (J) (i) provides for adjustment of the "excess profits net income" for each base period year by disallowance of deductions which are abnormal in class. Subsection (J) (ii) provides for adjustment of the excess profits net income for each base period year by disallowing abnormalities in amount. That is to say, once a class is established as normal for a taxpayer under subsection (J) (i), it may still be disallowed in an amount which exceeds 125 per cent of the deductions taken for such class for the 4 previous taxable years. Subsections (J) (i) and (J) (ii) are modified by section 711 (b) (1) (K) (iii), which limits any disallowance so that it cannot exceed the amount by which the deductions for a class for the base period years exceed the deductions for the same class in the taxable year in which the excess profits tax is being computed.

In this case, petitioner made certain expenditures for employee retirement benefits in all of its base period years, i. e., 1936–1939, inclusive. Prior to 1938, petitioner had no fixed arrangements for providing its employees with retirement benefits. That is to say, prior to 1938, petitioner merely paid voluntary pensions to a limited number of employees on a year-to-year basis. Effective as of September 1, 1938, petitioner entered into three group annuity contracts which were to fix and to fund pensions and retirement arrangements for all of its employees in both the United States and Canada. Any voluntary payments made thereafter by petitioner were only for particular individuals in cases of extreme hardship.

Petitioner asks this Court to find, as an ultimate fact, that the expenditures made by it for employee retirement benefits, as deducted by it in the base period years, consist of four separate classes of deductions for purposes of the subsection (J) adjustments. The following constitute petitioner's contentions and what petitioner asks the Court to find and conclude:

(1) Deductions which were taken in all of the base period years (1936–1939) for discretionary payments made by petitioner to certain retired employees, which petitioner calls voluntary and unfunded pensions, constituted a class of deduction normal for petitioner. Such deductions during the base period years 1936 and 1937 were abnormal in amount under subsection (J) (ii). Such deductions exceeded the limitations imposed by subsection (K) (iii), and should be disallowed in the amounts of $2,290.43 for 1936, and $15,939.84 for 1937.

(2) Deductions for funded pensions, i. e., for a single premium paid to purchase life annuities in 1938 for retired employees who were receiving voluntary pensions, and for employees who would be eligible to retire by December 31, 1938, constituted a class of deduction abnormal for petitioner under subsection (J) (i). Such deduction exceeded the limitation imposed by subsection (K) (iii), and should be disallowed for the base period year 1938 in the amount of $1,926,680.77.

(3) Deductions for future service retirement annuities in the years 1938 and 1939, which provide benefits for continuing employees based on service after 1938, are a class of deduction abnormal for petitioner for 1938 under subsection (J) (i) ; they are normal for petitioner in 1939; but they are abnormal in amount under subsection (J) (ii). However, because of the limitation of (K) (iii), petitioner asks for no disallowance of deductions for either of the base period years 1938 and 1939.

(4) Deductions for past service retirement annuities in the years 1938 and 1939, which provide benefits for continuing employees based on service prior to 1938, constituted a class of deduction abnormal for petitioner under subsection (J) (i) for both 1938 and 1939. Petitioner requests no disallowance of such deduction for base period year 1938 due to the limitation of subsection (K) (iii), but asks for the disallowance of $241,739.93 for base period year 1939.

Respondent, on the other hand, contends that petitioner's deductions for all employee retirement benefits, whether voluntary or under the group annuity contracts, constituted only one class of deduction, and that such class was normal for petitioner. However, respondent has made the following determination: "To the extent this class of deductions was in excess of the limitations prescribed under section 711 (b) (1) (J) (ii) and (K) (iii), they have been disallowed in an amount equal to such excess in computing the excess profits credit based on income under section 713 of the Internal Revenue Code." Respondent granted petitioner certain refunds based on the above determination.

Subsection (J) provides that the classification of deductions shall be determined under regulations prescribed by the Commissioner. Regulations 112, section 35.711 (b)–2, deal with the general subject

of abnormal deductions in the base period, and provide that deductions which are treated under subsection (J) "may be grouped by the taxpayer, subject to approval by the Commissioner on the examination of the taxpayer's return, in such other classes as are reasonable in a business of the type which taxpayer conducts, and are appropriate in the light of the taxpayer's business experience and accounting practice." The question of classification, therefore, becomes largely one of fact. Cf. *Green Bay Lumber Co.*, *supra*; *Great American Indemnity Co.*, 19 T. C. 229, affirmed per curiam 211 F. 2d 407.

Petitioner discusses various and allegedly unusual features which each one of its four categories of retirement benefits had so as to make one category different from each of the others, in order to refute respondent's contention that all four categories constituted one class for purposes of subsections (J) (i) and (J) (ii). Petitioner argues, for example, that the large payment of $1,926,680.77, which it made in 1938 to purchase life annuities for 263 persons who had retired from petitioner's employ during the years 1918 through 1938, is a separate class because the payment was a single and nonrecurring payment, because it was exceptionally large, because it constituted a fixed commitment on the part of petitioner as compared with its purely voluntary payments in prior years, and because it constituted an unusual benefit in contrast with ordinary pension plans.

None of these reasons are persuasive. It is difficult to see how petitioner's kind of funded pensions differ as to class from, for example, the voluntary pensions for which it had been making payments previously. The size of the payment, alone, is no justification for making a separate classification. *Great American Indemnity Co.*, *supra*. Petitioner entered into a fixed commitment by the purchase of the life annuities, but it did so just as voluntarily as it voluntarily had paid pensions on a year-to-year basis prior to 1938. Petitioner merely prepaid for future years, retirement benefits for which it had been paying previously on an annual basis. Such annuity purchases were merely a voluntary continuation of a voluntary retirement benefit policy which petitioner had commenced many years before 1938.

In this respect, petitioner's situation does not differ from that in *Frank Shepard Co.*, 9 T. C. 913. There the corporate taxpayer had never paid a pension to any employee prior to 1938. Early in 1938, the taxpayer retired 2 employees who had become too old to continue their work, and voluntarily paid them pensions aggregating $1,529. In 1939, and in subsequent years, the voluntary pensions were continued to these 2 persons. However, in 1938, the taxpayer purchased single premium annuity policies for 21 employees, who had been with it for 19 years or more, at a total cost of $50,815.46. In 1939, 2 more employees came within the 19-year-service group and 2 more single premi-

um annuity policies were purchased. In addition, single premium annuity policies were purchased for 6 persons who were 50 years of age or over, at a cost of $15,237.53. The policies provided for annuity benefits commencing when the annuitant reached the age of 65. This Court held in considering the application of subsections (J) (i) and (J) (ii) as follows (p. 924) :

It is also our opinion and holding that the expenditures for both premiums and pensions constitute one single "class" of deductions as that term is used in the statute. The objective of both expenditures was substantially the same, and we know of no reason why they should not be grouped into one class for the purpose at hand.

In this case, petitioner's voluntary pension payments and its single premium payment for funded annuities are not different from one another. One was a continuation of the other. In petitioner's own explanation to its stockholders it stated:

Although the cost to purchase annuities for Past Service for our people is a large amount, it will cost the Company very much less to purchase annuities than to continue our present policy of paying all pensions out of current earnings or surplus as we go along. It is estimated that pensions based on service before September 1, 1938, in 15 to 17 years will reach a total of nearly $400,000.00 per year, not including the additional amount of pensions based on service after September 1, 1938. The large saving in cost is the result of interest earnings at favorable rates on the funds turned over to the insurance companies.

Furthermore, it does not appear that any of the characteristics of petitioner's expenditures in 1938 and 1939 for the past service annuities and for the future service annuities led to a separate classification for those amounts. Petitioner, in these two categories, merely established methods of computing retirement benefits, and of minimizing its cost by providing for employee contributions in the cases of those rendering services after the effective date of the plan.

In other words, petitioner converted its voluntary retirement arrangement into certain fixed arrangements. The record as a whole shows that the objective of petitioner's plan, and the expenditures for both premiums and pensions for the four categories of benefits, was substantially the same. Varying degrees of social security were provided for retired employees, for continuing employees when they did retire, and for the families of deceased employees which covered periods of time under those circumstances when regular salary payments would no longer be forthcoming; e. g., during retirement, or disability, and upon death.

This singleness of purpose is apparent from careful analysis of the entire record. According to the testimony of an insurance company pension consultant, "A group contract is like a tent: It covers everything, and everything is built under it." In the words of the insurance contract itself: "The retirement annuity benefits to be provided, in

accordance with the Plan for the several Active Employees covered hereunder, consist of Past Service Annuities and Future Service Annuities as specified in the Plan." The special provisions of the contract provided that the "Past Service Annuity" was to include the categories which petitioner has called "funded pensions" and "Past Service Retirement Annuities." In petitioner's explanatory booklet entitled "Retirement Annuity Plan," petitioner's objective was stated to be the provision of "regular income after retirement for employees * * * who are or may hereafter become eligible under the Plan." In this booklet, petitioner discussed the advantages of the "Future Service Retirement Annuities," and it stated that "older employees who are nearing or may have reached Normal Retirement Age have little or no chance now to build up retirement credits through 'Future Service.' The Company recognizes the faithful and loyal service they have rendered in the past years and as it is able expects to make up the necessary credits for this so-called 'Past Service.' "

The record as a whole shows that the objective of petitioner's retirement arrangements for all four categories of benefits was substantially the same. The difference between the number of employees covered under petitioner's old voluntary plan, and under its new group annuity policies is only one of degree and it does not change the character of petitioner's deductions. Cf. *Tovrea Land & Cattle Co.*, 10 T. C. 90.

Petitioner's reliance on its accounting entries is also misplaced. Although these are of some importance, separate classification and treatment by petitioner's accounting staff for bookkeeping purposes does not control the question of separate classification for the purposes of section 711 (b) (1) (J). Cf. *Frank H. Fleer Corporation*, 10 T. C. 191. In any event, after a careful examination of petitioner's books, tax returns, and refund claims, we are aided little in the matter of classification because of the vagueness of petitioner's entries in its books, as well as because of its many inconsistent positions.

It is concluded and held that petitioner's expenditures under its earlier policy of paying voluntary pensions and under the group annuity contracts for all four types of benefits, i. e., voluntary pensions, funded pensions, past service retirement annuities, and future service retirement annuities, constitute one single "class" of deductions as the word "class" is used in the statute. The objective and purpose for all four types of expenditures was substantially the same, and we know of no reason why they should be grouped into more than one "class" for the purpose of the statute. *Frank Shepard Co.*, *supra*; *Arrow-Hart & Hegeman Electric Co.*, 7 T. C. 1350.

The uncontroverted facts show that petitioner's policy of providing retirement benefits for its employees was initiated prior to the base period. In *Frank Shepard Co.*, *supra*, we held that the continuation

of a class of deductions in subsequent years established a definite course of conduct rendering such deductions normal in the later years. Accordingly, it is held that all of the deductions for petitioner's employee retirement benefit expenditures in the base period years before us were all of a class normal for petitioner. See, also, *Colonial Amusement Co. of Philadelphia*, 11 T. C. 67.

In essence, the dispute between the parties relates to the payments in 1938 for funded pensions, and the payments in 1939 for past service retirement annuities. Our conclusion that petitioner had one class of deductions, only, means that petitioner's theory about both items is rejected.

It appears that respondent has allowed petitioner the maximum permissible relief under section 711 (b) (1) (J) (ii) and (K) (iii) in regard to any abnormalities in amount. Both parties have stipulated that the excess amount of the deductions during the base period years for pensions and group annuity premiums was not a consequence of an increase in petitioner's base period gross income, or a change at any time in the type, manner of operation, size, or condition of the business engaged in by petitioner; and the record is amply clear that the excess of such deductions was not a consequence of a decrease in the amount of some other deduction in petitioner's base period. Therefore, no adjustments need be made because of the limitations of section 711 (b) (1) (K) (ii). By virtue of respondent's determinations, petitioner's refund claims were allowed in part. Respondent's determinations are consistent with the conclusions we have reached. It is our understanding, therefore, that Rule 50 recomputations are not necessary.

*Decision will be entered for the respondent.*